870 So.2d 711 (2003)
Ex parte Denise Marcil KELLEY.
(In re Denise Marcil Kelley v. State of Alabama).
1012018.
Supreme Court of Alabama.
June 27, 2003.
*712 Derek E. Yarbrough of Motley, Motley & Yarbrough, LLC, Dothan, for petitioner.
William H. Pryor, Jr., atty. gen., J. Thomas Leverette, deputy atty. general, and Daniel W. Madison, asst. atty. gen., for respondent.
HARWOOD, Justice.
After being indicted by the Houston County grand jury for unlawful possession of methylenedioxymethamphetamine, commonly known as "Ecstasy," a violation of Ala.Code 1975, § 13A-12-212, Denise Marcil *713 Kelley entered a plea of not guilty. She filed a motion to suppress the evidence that was the basis of her indictment on the ground that it was the product of an unlawful search and seizure. At the beginning of the hearing on that motion, conducted on August 22, 2001, Kelley agreed to plead guilty if the motion was denied, but reserved the right to appeal the denial. After the trial court denied the motion, Kelley withdrew her not-guilty plea, entered a plea of guilty, and, upon being convicted and sentenced pursuant to that plea, exercised her right to appeal to the Alabama Court of Criminal Appeals. On June 21, 2002, that court affirmed her conviction by an unpublished memorandum. See Kelley v. State, (No. CR-00-2683, June 21, 2002) 860 So.2d 913 (Ala. Crim.App.2002) (table). After that court overruled her application for rehearing, she petitioned this Court for a writ of certiorari to the Court of Criminal Appeals. We granted Kelley's petition on October 29, 2002, to address whether the Court of Criminal Appeals properly affirmed the trial court's holding that the evidence seized from Kelley was admissible. We heard oral argument on April 17, 2003.
As summarized by the Court of Criminal Appeals in its unpublished memorandum, the record reveals the following facts:
"Three plainclothes police officers had entered Grand Central Station, a bar located in Dothan, because the police department had received numerous complaints concerning drug activity at the bar. Corporal Andy Martin testified that he saw Clint Adkinson and another man enter the bathroom and make a transaction. He testified that he saw Adkinson hand something to the other man in exchange for money. Officer Brent Parrish then entered the bathroom and attempted to buy drugs from Adkinson. Adkinson told Officer Parrish that he did not have any drugs and left the bathroom. He walked through the bar and sat next to the appellant. Corporal Martin testified that he saw Adkinson give Kelley something that appeared to be a Tic-Tac [brand breath-mint] box. He testified that Kelley put the box into her coat pocket, and that she and Adkinson then walked away from one another. Corporal Martin approached Kelley, identified himself, and told her to remove her hands from her coat pockets. He found in her closed hand a matchbox, which he took from her. He testified that [in the matchbox] he found three green pills with `smiley faces,' which were later identified as Ecstasy."
A number of more detailed, additional facts are contained in the record, all provided by the testimony of Cpl. Andy Martin at a preliminary hearing conducted on the charge on January 22, 2001, in the Houston District Court and later at the suppression hearing. Cpl. Martin was the only witness to testify at the two hearings. At the suppression hearing, counsel for Kelley produced a full transcript of the preliminary hearing, marked as "Defendant's Exhibit 1," and used it initially to attempt to refresh Martin's recollection. Subsequently, defense counsel stated, "Judge, I would offer this transcript of the preliminary hearing for your purposes, and ask you to read that...." When the assistant district attorney advised that she was uncertain if she had been present at the preliminary hearing, but that she had not read any transcript of it, defense counsel again asked the judge to read the transcript, explaining that "it's relevant in this matter." The judge responded, "O.K. I'll read it."
Although there is no explicit indication in the remainder of the transcript of the *714 suppression hearing that the judge actually read the transcript of the preliminary hearing before announcing his ruling at the conclusion of the hearing, there are indications that he took some time on two occasions during the hearing to do some reading, although apparently he was reading copies of caselaw submitted by the attorneys. At the conclusion of the hearing the trial judge stated that he found probable cause for the search and denied the suppression motion. Thereupon, Kelley pleaded guilty, pursuant to a plea bargain, but again announced her reservation of the right to appeal the denial of her suppression motion, and she obtained the judge's permission for that procedure.
Within 30 days of her conviction and sentence, however, Kelley filed, on September 18, 2001, a "motion to reconsider," asking the trial judge to reconsider its denial of her motion to suppress. The trial judge denied that motion the following day, and the record is silent as to what materials, if any, he might have considered in the interim. Nonetheless, the procedural posture of the case is such that, the complete transcript of the preliminary hearing having been "introduced" as an exhibit at the suppression hearing by defense counsel, who procured the trial judge's commitment that he would read it, and the judge's having had the opportunity to read it in connection with his consideration of the motion for reconsideration, Martin's testimony at both hearings is legitimately a part of the record we review on this appeal. This is so despite the fact that, during oral argument on this case, the attorney general's responses to questions from this Court acknowledged that the State was not relying on any facts that might have been developed only during the preliminary hearing. An appellate court will affirm the trial court's judgment if its ruling is correct on any valid ground or rationale, even one rejected or not considered by the trial court, so long as notice of the ground, and an opportunity to respond, is shown by the record to have been available, to satisfy the minimum requirements of due process. Ex parte Boyd, 715 So.2d 852 (Ala.1998); Harnage v. State, 290 Ala. 142, 274 So.2d 352 (1972); and Strickland v. State, 771 So.2d 1123 (Ala.Crim.App. 1999). In this case, of course, all of Martin's testimony from the preliminary hearing was before the trial court as a part of the suppression hearing by virtue of its "introduction" by defense counsel, accompanied by his repeated request that the trial judge consider it, and the trial judge's agreement that he would read it.
Thus, the evidence before the trial court consisted of Martin's oral testimony before him and the transcript of Martin's testimony from the preliminary hearing. When an appellate court reviews the findings and holdings of a trial court resulting from a hearing on a motion to suppress evidence, if the evidence before the trial court was undisputed, the "ore tenus rule," pursuant to which the trial court's conclusions on issues of fact are presumed correct, is inapplicable, and the reviewing court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court's application of the law to those facts. State v. Hill, 690 So.2d 1201, 1203 (Ala.1996). Although in his brief to this Court defense counsel describes the applicable standard of review as being that "[a] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on the appellate court and such ruling will not be disturbed on appeal unless it is palpably contrary to the weight of the evidence," and quotes caselaw to the effect that this standard of review is applicable "even where the matter rests upon the testimony of only one witness, [because] the trier of *715 fact is free to accept or reject the witnesses' statements," we conclude that a de novo standard of review is applicable in this case; the de novo standard is always favorable to the party appealing from an adverse ruling on a motion to suppress. See State v. Hill, supra, 690 So.2d at 1204, for similar rationale. Martin's testimony, although more detailed as to certain aspects of the underlying circumstances at the preliminary hearing and more detailed as to other aspects at the suppression hearing, was not, in the final analysis, internally inconsistent or contradictory. At the suppression hearing, he explained all seeming inconsistencies between his testimony at that hearing and his testimony at the preliminary hearing, and otherwise provided the trial court with what was, in the final analysis, undisputed testimony.
When we consider the "blended" testimony presented by Martin at the two hearings, we conclude that the trial court had available to it the following description by Martin of the circumstances and considerations which led to his decision to stop and search Kelley:
On Saturday, January 13, 2001, at some point between 1:30 and 2:00 a.m., Martin and two other Dothan police officers went to a local bar known as Grand Central Station because they had received "numerous, numerous complaints of drug activity taking place at that establishment," particularly sales and purchases of Ecstasy "out in the open." Martin and his two companions were working undercover as narcotics investigators on this occasion, wearing "plainclothes."
Martin had worked in narcotics investigation for about two and a half years. He had undergone specialized training in preparation for his work in that particular area of law enforcement and had worked not only in the Dothan area, but in several Alabama counties other than Houston County. On some occasions he had worked undercover, actually "buying the dope from people," which had given him personal knowledge about "how those type transactions take place." In that regard, he had learned that "the biggest part is just watching peoples' hands and watch what their hands do, where there hands go... passing the dope or the money." Martin could not calculate how many arrests he might have made for possession of controlled substances, but he confirmed that he had had "a lot of experience."
The three officers each ordered a beer at one of the bars downstairs and then went upstairs to the balcony area where they could observe the lower level, which included the dance floor and two bars. Eventually they saw an individual named Clint Adkinson, accompanied by another man, come up the stairs and enter a bathroom located some 15 to 20 feet from where they were sitting. The officers had prior information on Adkinson, because "he's been arrested before, and he's in our computer, in our intelligence part, about selling Ecstasy." Martin had previously had some sort of drug case pending involving Adkinson, although he could not remember what kind of drug was involved.
After Adkinson and the other man entered the bathroom, the door to it "never closed, because it's one of the bathroom doors that when it opens it closes real slow." Through the partially open door Martin observed Adkinson pass something to the other man who, in turn, gave Adkinson some money. Martin could not see what Adkinson passed to the other man because "they were trying to hide whatever it was," but he could see money, in the form of "a bill," being handed back to Adkinson. The other man emerged from the bathroom first, and he "came out and nodded his head to some other guy, who we didn't know," and those two individuals *716 then left together, walking down the stairs. One of the other undercover officers then went into the bathroom and asked Adkinson if he had any Ecstasy that he could get for him, but Adkinson told him that he did not have anything, that he did not sell drugs. Nonetheless, based on Martin's "experience as taking place in actual drug transactions myself, and actually seeing numerous drug transactions taking place between individuals," his assessment of what he had seen take place in the bathroom was that it appeared to be a drug transaction.
Adkinson subsequently emerged from the bathroom, went down the stairs, crossed the dance floor, and took a seat on a bar stool next to Kelley and a man later identified as her boyfriend. The bar stools were located "right up close to the dance floor" and there was no table in front of them; consequently, the officers had a clear view of the three. Adkinson sat to Kelley's right and her boyfriend was seated to her left. From the perspective of the officers watching from the balcony across the dance floor, Adkinson was to their left, Kelley was in the middle and the boyfriend was on the right. The record contains no information as to whether any conversation ensued between Adkinson and Kelley. Martin saw Adkinson place his right hand into his right pocket, and then pull his hand out "just a little bit," right at the edge of the pocket. Martin could see Adkinson looking down at something "cupped" in his hand, which shielded the object from Martin's view, and Adkinson "just kept looking down at it." Adkinson then transferred the object into his left hand and "was trying to hide it and slide it over to [Kelley]." At that time, Martin had a sufficient view of the object that he thought it looked like a Tic-Tac brand breath-mint box. Martin testified that "we've made cases where Ecstasy was carried in tic-tac boxes inside the place before." When Adkinson passed the object to Kelley with his left hand, "she grabbed it over with her hand like that (indicating )." (Emphasis supplied.) She had the small container cupped in her right hand "trying to hide it," and slid it into the right pocket of a long black jacket she had folded across her lap. Before Kelley slid the object into her jacket pocket, she looked at it, but Martin never saw her look in it. Martin never saw Kelley give Adkinson any money. Adkinson subsequently got up and started walking around; he was seen "counting money."
Because the transfer from Adkinson to Kelley appeared to Martin also to be a drug transaction, he and his companions went downstairs and took positions near where Kelley and her boyfriend were still seated. After a couple of minutes, Adkinson came back to where Kelley and her boyfriend were seated, and the couple got up and started heading toward the front door of the bar, and Adkinson was walking behind them. The other two officers stopped Adkinson, and Martin continued to follow Kelley and her boyfriend. After Kelley and her boyfriend had proceeded "into the front bar," and then gone through "two-wooden doors that go to the bar where you enter the place at," they stopped, and it appeared to Martin that they were waiting on Adkinson. Kelley had put her jacket on by that time and when Martin approached her and identified himself as a police officer, she put her hands into her jacket pockets. Martin instructed her to take her hands out of her pockets, which she did. In doing so, "she came up with her right hand like this, and I knew she had something in there (indicating)." (Emphasis supplied.) It appeared to Martin that she was "trying to get rid of" what she had in her right hand, "[t]hat's why she had them in her hand. Looked like she was going to throw them."
*717 In fact, as Martin had approached and identified himself to Kelley, "she was already in the process of pulling her right hand out of her pocket, and I asked her to take both of her hands out of her pockets." Martin "grabbed her right hand and turned it over" and saw what appeared to be a matchbox clutched in it. Martin told Kelley "not to do anything stupid" and to let him have the matchbox, which she did. As noted, when Martin was describing to the trial judge what Kelley had done with her right hand when she removed it from her pocket, he demonstrated her motion to the judge, stating "she come up with her right hand like this ... (indicating)." (Emphasis supplied.) Because the nature of that maneuver was not otherwise described or explained in the record, but was viewed by the trial judge, we are not in a position independently to assess Martin's characterization of Kelley's action as reflecting that she "was trying to get rid of them" and "[l]ooked like she was going to throw them." After taking the matchbox from Kelley, Martin looked inside it and found "[t]hree small pills with the smiley faces, on them," which "field tested" positive for "methamphetamine." The stop and search of Kelley took place about 30 minutes after the officers first arrived at Grand Central Station.
The record is not clear as to when the "numerous, numerous complaints" about drug activity at Grand Central Station had been made. At one point during defense counsel's cross-examination of Martin at the suppression hearing, he asked him "[w]as there information that night, or within, you know, 48-hours or 72-hours?" but immediately followed that question, before Martin could answer it, with the more specific question, "Was there any information on Ms. Kelley?" Martin answered "not to my knowledge," after which defense counsel asked, "Was there any information on Clint Adkinson," eliciting Martin's response "not that I know of." All we can really infer from those exchanges is that Martin was apparently responding to the inquiries about whether there had been any information specifically on either Kelley or Adkinson within the preceding 48 or 72 hours.
In its unpublished memorandum upholding the trial court's denial of Kelley's motion to suppress, the Court of Criminal Appeals stated, in pertinent part:
"On appeal, Kelley argues that Corporal Martin did not have probable cause to stop her and to conduct a warrantless search.
"In Woods v. State, 695 So.2d 636, 640 (Ala.Crim.App.1996), this Court stated the criteria for determining whether probable cause exists:
"`"Whether there is probable cause [to] merit a warrantless search and seizure is to be determined by the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). `Probable cause exists where all the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed and that contraband would be found in the place to be searched.' Sheridan v. State, 591 So.2d 129, 130 (Ala.Crim.App.1991)."
"`State v. Stallworth, 645 So.2d 323, 325 (Ala.Cr.App.1994). Stated another way, "[t]he test for probable cause is `whether the facts available to the officer at the moment of the seizure or search, would warrant a man of reasonable caution to believe that the action taken was appropriate.'" Ivey v. State, 698 So.2d 179 (Ala.Crim.App. 1995) (citations omitted).'
*718 "A review of the record indicates that Corporal Martin did have probable cause to stop and search Kelley and that the trial court properly denied her motion to suppress. At the suppression hearing, Corporal Martin testified to the following facts: (1) that he is a narcotics investigator with the Dothan Police Department and that he had received special training in narcotics; (2) that the Dothan Police Department had received numerous complaints of drug activity at Grand Central Station; (3) that he and his partners had observed Clint Adkinson give something to another man in exchange for money; and (4) that he had then seen Adkinson give something to Kelley, which she furtively slipped into her jacket pocket. Under the standard outlined in Woods, the totality of the circumstances known to Corporal Martin was sufficient to give him probable cause to believe that Kelley was in possession of a controlled substance. Therefore, the trial court properly denied her motion to suppress."
Martin acknowledged at the suppression hearing that his purpose in intercepting Kelley as she was leaving the bar was to "find the box that she had put in her pocket" and that he intended then to search her for it. Nonetheless, we have no difficulty in finding that Martin had observed sufficient activity, which, when viewed through the lens of his specialized training and experience, provided him with "reasonable suspicion" sufficient to authorize a warrantless investigatory "stop" of Kelley. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Arvizu, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Defense counsel agreed at oral argument that, if called upon to assume a permissible Terry stop, then Martin's instruction to Kelley to remove her hands from her jacket pockets was a precaution permissible for Martin to take under the auspices of Terry and its progeny, for reasons relating to Martin's personal safety. See Ex parte Tucker, 667 So.2d 1339, 1345 (Ala.1995). As defense counsel acknowledged, the actual "search" and seizure being challenged was the search and seizure that began when Martin grabbed Kelley's right hand.
A warrantless search, as Martin conducted, is per se unreasonable under the Fourth Amendment to the United States Constitution, subject only to a few specific exceptions recognized under the law, and the burden is on the State in a case such as this to show that one or more of those exceptions is applicable. Kinard v. State, 335 So.2d 924 (Ala.1976). Those well-established exceptions to a warrantless search are: (1) plain view; (2) consent; (3) incident to lawful arrest; (4) hot pursuit or emergency situations; (5) exigent circumstances coincidental with probable cause; and (6) stop-and-frisk situations. Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973). See also Wilkinson v. State, 374 So.2d 400 (Ala.1979); Spann v. State, 494 So.2d 716 (Ala.Crim.App.1985); Vogel v. State, 426 So.2d 863 (Ala.Crim. App.1980). "Under the rule declared by the Supreme Court of the United States in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 [(1961)], all evidence obtained by searches and seizures in violation of the Constitution is inadmissible in a state court." Loyd v. State, 279 Ala. 447, 452, 186 So.2d 731, 736 (1966).
The State argues that Martin was entitled to search Kelley and to seize the discovered matchbox and its contents under the exception of exigent circumstances coupled with probable cause. "`"Exigent circumstances exist whenever an object to be searched is mobile or moveable...."'" State v. Shelton, 741 So.2d 473, 477 (Ala.Crim.App.1999)(quoting Woods v. *719 State, 695 So.2d 636, 641 (Ala.Crim.App. 1996)); Johnson v. State, 719 So.2d 272, 273 (Ala.Crim.App.1998). Kelley was leaving the bar when she was stopped, and then searched, by Martin; thus, exigent circumstances, as conceived under the law, were present. The real question in this case is whether Martin had probable cause to restrain and search Kelley's right hand.
Kelley relies heavily on Ex parte Tucker, 667 So.2d 1339 (Ala.1995), in arguing that there was no probable cause. In that case, police officers on patrol in a "high crime" area stopped at a known "shot house"[1] in front of which several individuals, including Eddie Jerome Tucker, were gathered. No complaints concerning any illegal activity occurring at the house that day had been reported to the officers, nor were the officers otherwise aware of any illegal activity at that location that day. One of officers noticed a "large bulge" in Tucker's pocket and asked him to remove the object from his pocket for "safety reasons." Tucker removed a closed 35mm film canister. "[W]hen asked, Mr. Tucker did not hesitate to show the officers that the object in his pocket was a film cannister and not a weapon." 667 So.2d at 1345. When the officer asked Tucker what was inside the canister, however, he placed it behind his back. The police officer then asked for the canister and Tucker complied. The officer "asked for the canister in such a way that Mr. Tucker knew he should not withhold it...." 667 So.2d at 1344. The officer opened the canister and found marijuana inside. Tucker was convicted of possession of marijuana after unsuccessfully moving the trial court to suppress the evidence. The Court of Criminal Appeals upheld the conviction, holding that it was the product of a lawful search, seizure, and arrest.
This Court granted certiorari review and reversed the judgment of the Court of Criminal Appeals, stating, in pertinent part:
"The Court of Criminal Appeals based its affirmance of Mr. Tucker's conviction on a holding that the search of the film canister was justified under the `probable cause coupled with exigent circumstances' exception to the warrant requirement. The first element of the exception has been described as follows:
"`Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.'

"Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1310-11, 93 L.Ed. 1879 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)); accord Nicaud v. State ex rel. Hendrix, 401 So.2d 43 (Ala.1981); Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973). Probable cause, however, `cannot be founded upon mere suspicion.' Nicaud, 401 So.2d at 46.
"The State avers that the following facts and circumstances were known to Sgt. Hurter: The area of the patrol was a high crime area in regard to which there had been past reports of the illegal sale of alcohol and drugs; Mr. Tucker was observed `congregating' with a group in front of a house owned by a person who had been recently arrested for the illegal sale of alcohol; during the execution of a search warrant at the shot house two to three weeks before *720 Mr. Tucker's arrest, a container of crack cocaine and approximately two marijuana cigarettes were found on a bench presumably located on the front porch of the house where persons had been gathered but had dispersed when police arrived; film canisters are commonly associated with the possession and use of drugs; and Mr. Tucker put the film canister behind his back when asked about its contents. We note that there are also countervailing facts and circumstances, as stated below.
"The fact that an area is known for crime may serve to create a reasonable suspicion in the minds of the police that may support a finding of probable cause. Dixon v. State, 588 So.2d 903 (Ala.1991), cert. denied, 502 U.S. 1044, 112 S.Ct. 904, 116 L.Ed.2d 805 (1992). Thus, the officers were justified here in stopping to question the persons gathered in front of a shot house in a high crime area. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Just as the officers, for their own safety, would have been justified also in frisking those assembled, id., Capt. Lee was justified in asking to see what was in Mr. Tucker's pocket; Capt. Lee could clearly see a bulge in Mr. Tucker's pocket that, without inspection, could not be conclusively identified as not being a weapon. The question, then, is whether Sgt. Hurter's search and seizure of the film canister after Mr. Tucker had responded to his question concerning its contents by putting the canister behind his back was supported by probable cause.
"The fact that persons have gathered in a high crime area cannot alone establish probable cause justifying the warrantless search and seizure of containers in their possession. This is especially true here, because: the police had received no specific complaints concerning illegal activity in the area of the shot house on October 9; the police had received no specific complaints concerning the persons gathered in front of the house on that day; the persons were in the roadway or in the yard near the roadway and were in close proximity with the shot house, but were not on the porch and were not suspected of having recently been in the house; the officers had no reason to suspect that those present had been involved in past illegal activity at the shot house; and there was no indication when the police stopped that anything illegal was occurring. We do not totally discount the factor of a high crime area in our analysis of probable cause, but we give it less weight than other factors, under the circumstances of this case.
"The controlling factors in this case are the association of film canisters with the use and possession of drugs and the act of Mr. Tucker in putting the canister behind his back when he was questioned concerning its contents. The State argues that the film canister was a suspicious object because in Sgt. Hurter's experience he had `probably seen several hundred of them' containing narcotics. It is clear that the expertise and experience of a police officer may be taken into account in applying the probable cause test, see Pearson v. State, 542 So.2d 955 (Ala.Crim.App.1989), and that the test of probable cause is indeed concerned with probabilities, `factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Brinegar, supra, 338 U.S. at 175, 69 S.Ct. at 1310.
"Reliance on an officer's special expertise and experience, however, `most commonly occurs when an officer is able to identify some illegal substance by smell or by sight because of his training or experience in making such identifications,' *721 when a layman would not be qualified to identify the substance. W. LaFave, 1 Search and Seizure § 3.2(c) at 571-72 (2d ed.1987). The appearance of crack cocaine and the difference in appearance between a marijuana cigarette and a hand-rolled tobacco cigarette are examples. See People v. Poole, 48 Cal. App.3d 881, 122 Cal.Rptr. 87 (1975). We again note that, although the determination of probable cause may involve probabilities, mere suspicion is insufficient to support a finding of probable cause.
"Here Sgt. Hurter's experience was that, as a narcotics officer, he had seen many film canisters containing narcotics. Setting aside for the moment Mr. Tucker's act of putting the canister behind his back, we find no other facts to support a conclusion that this particular canister contained narcotics. Mr. Tucker was not previously known to the officers, there had been no reports of drug dealings at the shot house on October 9, there had been no complaints concerning the persons gathered in front of the shot house on that day, and, when asked, Mr. Tucker did not hesitate to show the officers that the object in his pocket was a film canister and not a weapon. Additionally, there was no indication that anything illegal was occurring as the police arrived: the police witnessed no transactions between the men assembled, they smelled no smoke when they exited the car, and they saw no one leave at their arrival.
". . . .
"... The United States Supreme Court has stated:
"`[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.'

"Sibron [v. New York], 392 U.S. [40] at 66-67, 88 S.Ct. [1889] at 1904, 20 L.Ed.2d 917 [(1968)] (citations omitted). Professor LaFave has commented upon this language as follows:
"`Thus, if the police see a person in possession of a highly suspicious object or some object which is not identifiable but which because of other circumstances is reasonably suspected to be contraband, and then observe that person make an apparent attempt to conceal that object from police view, probable cause is then present.'
"W. LaFave, 2 Search and Seizure § 3.6(d) at 58 (2d ed.1987).
". . . .
"The language of the Supreme Court set out above [from Sibron ], as well as the cases from our Court of Criminal Appeals applying this language, implies that furtive movement, in the instances in which it is not simply running away, is typically some stealthy act to conceal an object from initial view by the police or by strangers or to quickly dispose of the object."
667 So.2d at 1344-48. Stating that "[t]his is a close issue," 667 So.2d at 1347, and that "[a]dmittedly the line is difficult to draw," 667 So.2d at 1348, this Court nonetheless concluded that Tucker's act of putting the canister behind his back, after it had already been fully exhibited to the police officers, could not be viewed as a "furtive gesture." 667 So.2d at 1347-48. Rather, that act was deemed consistent with an assertion of privacy in a personal effect. 667 So.2d at 1348.
The following circumstances distinguish the facts of the present case from those of Tucker:
*722 (1) In Tucker, Tucker readily showed the small object in question, a film canister, to the police officers; there was nothing furtive about his handling of it in the process. Only after the officers had had a full view of it did Tucker place it behind his back when questioned concerning its contents. Martin, on the other hand, had observed Adkinson furtively handling the small container, only partially exposing it to the edge of his pocket while studying it, cupping it with his right hand, transferring it to his left hand, and then, while still "trying to hide it,"[2] sliding it into Kelley's right hand. Martin watched Kelley grab the object and likewise cup it in her right hand, also "trying to hide it" (see n. 2), and slide it into a pocket of her jacket folded across her lap. Finally, Martin saw her move and position her right hand with the object in it, upon his approach and identification, in such a way as to indicate to him that she was "trying to get rid of" the matchbox containing the pills, it appearing to him that "she was going to throw them." As noted, Martin demonstrated to the trial judge how Kelley "come up with her right hand like this," but we are not privy to that demonstration and, thus, cannot second-guess any inference the trial judge might have drawn from the demonstration. Therefore, given that state of the record, this case, unlike Tucker, involves a connected series of what the trial judge could reasonably have concluded, based on the evidence put before him, represented "furtive acts." As noted in Tucker, 667 So.2d at 1347, Professor LaFave has commented as follows:
"`Thus, if the police see a person in possession of a highly suspicious object or some object which is not identifiable but which because of other circumstances is reasonably suspected to be contraband, and then observe that person make an apparent attempt to conceal that object from police view, probable cause is then present.'
"W. LaFave, 2 Search and Seizure § 3.6(d) at 58 (2d ed.1987)."
(Professor LaFave includes that same passage, verbatim, in the most recent edition of his treatise: 2 W. LaFave, Search and Seizure § 3.6(d) at 319 (3d ed.1996).) As also noted in Tucker, a furtive movement, when not a suspect's flight, "is typically some stealthy act to conceal an object from initial view by the police or by strangers or to quickly dispose of the object." 667 So.2d at 1347-48. The Tucker court derived that understanding from "[t]he language of the [United States] Supreme Court as set out [in Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889 (1968)], as well as the cases from our Court of Appeals applying this language," 667 So.2d at 1347. The Sibron Court had stated:
"`[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.'"
Sibron, 392 U.S. at 66-67, 88 S.Ct. 1889.
(2) In Tucker "the police witnessed no transactions between the men assembled," *723 including Tucker. 667 So.2d at 1345-46. In the present case, Martin witnessed what he, drawing on his training and experience, interpreted as a drug transaction between Adkinson and another man in the bathroom, and then witnessed what appeared to be another transaction between Adkinson and Kelley.
(3) In Tucker, the act by Tucker that the State sought to have recognized as a furtive movementthe placing of the film cannister behind his backwas determined by this Court to represent only an assertion of a privacy right in a personal effect. In reaching that conclusion on that "close issue," 667 So.2d at 1347, the Court emphasized that Tucker never "attempted to hide or drop the canister, or otherwise attempted to prevent the police from initially observing the object in his pocket" and that, the incident having taken place "in broad daylight," Tucker "could not have concealed the canister by putting it behind his back, because he was in the presence of several police officers and at least two of the officers already knew that he had the canister." 667 So.2d at 1348.
In contrast, the stop of Kelley by Martin apparently occurred just outside the Grand Central Station bar between approximately 2:00 and 2:30 a.m., and Martin was the only police officer in the immediate vicinity. According to him, Kelley, who had previously furtively handled the small box Adkinson had passed to her, put her hands in her jacket pocket upon his approach and then withdrew her right hand with an object in it and appeared to be about to throw the object away. "Furtive gestures may be taken into account in determining whether probable cause exists." Walters v. State, 585 So.2d 206, 209 (Ala.Crim.App.1991). See also Jones v. State, 616 So.2d 949, 950-51 (Ala.Crim.App.1993). Even in a situation where there is only reasonable suspicion to stop an individual, a police officer's suspicion can legitimately ripen into probable cause where the officer observes furtive gestures after he or she has ordered the individual to stop. Walters, 585 So.2d at 209.
Martin has specialized training and experience in the field of illegal drug transactions. Relying on that training and experience, he drew various inferences about the nature of the unfolding series of events he witnessed. "[O]ur cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists." Ornelas v. United States, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).
"A trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference."
Ornelas, 517 U.S. at 699, 116 S.Ct. 1657. See also Arvizu, supra, discussing this principle, pursuant to which reviewing courts "must give `due weight' to factual inferences drawn by resident judges and local law enforcement officers." 534 U.S. at 273, 122 S.Ct. 744 (summarizing the holding of Ornelas, in that regard, 517 U.S. at 699, 116 S.Ct. 1657).
Whether Martin intended to search Kelley before he approached and identified himself and precipitated her additional furtive gestures, is not determinative of our analysis of whether probable cause existed to search her thereafter. "In determining whether there was probable cause to make an arrest, the officers' subjective intent is immaterial." State v. *724 Johnson, 682 So.2d 385, 388 (Ala.1996) (Maddox, J., concurring specially).
In Illinois v. Gates, 462 U.S. 213, 231-32, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court adopted the "totality-of-the-circumstances" approach for evaluating the presence or absence of probable cause, stating the following:
"Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a `practical, nontechnical conception.' Brinegar v. United States, 338 U.S. 160, 176 (1949). `In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Id., at 175. Our observation in United States v. Cortez, 449 U.S. 411, 418 (1981), regarding `particularized suspicion,' is also applicable to the probable cause standard:
"`The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the sameand so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'
"As these comments illustrate, probable cause is a fluid conceptturning on the assessment of probabilities in particular factual contextsnot readily, or even usefully, reduced to a neat set of legal rules...."
The United States Supreme Court has stated:
"Articulating precisely what `reasonable suspicion' and `probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with `"the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."' Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see United States v. Sokolow, 490 U.S. 1, 7-8 (1989). As such, the standards are `not readily, or even usefully, reduced to a neat set of legal rules.' Gates, supra, at 232. We have described reasonable suspicion simply as `a particularized and objective basis' for suspecting the person stopped of criminal activity, United States v. Cortez, 449 U.S. 411, 417-418 (1981), and probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found, see Brinegar, supra, at 175-176; Gates, supra, at 238. We have cautioned that these two legal principles are not `finely-tuned standards,' comparable to the standards of proof beyond a reasonable doubt or of proof by a preponderance of the evidence. Gates, supra, at 235. They are instead fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed. Gates, supra, at 232; Brinegar, supra, at 175 (`The standard of proof [for probable cause] is ... correlative to what must be proved'); Ker v. California, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (`This Cour[t] [has a] long-established recognition that standards of reasonableness *725 under the Fourth Amendment are not susceptible of Procrustean application'; `[e]ach case is to be decided on its own facts and circumstances' (internal quotation marks omitted)); Terry v. Ohio, 392 U.S. [1], at 29 [(1968)](the limitations imposed by the Fourth Amendment `will have to be developed in the concrete factual circumstances of individual cases').
"The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause."
Ornelas, supra, 517 U.S. at 695-96, 116 S.Ct. 1657.
Counsel for Kelley acknowledged at oral argument that the "totality of the circumstances for Mr. Adkinson I believe is bad," but urged this Court not to let those circumstances bleed over into our assessment of whether probable cause existed as to Kelley. He urged upon the Court the proposition that probable cause is "not contagious" and advocated that we limit our analysis of probable cause as it relates to Kelley to only those circumstances commencing when Adkinson sat down at the bar next to her. We cannot agree with this approach, because the totality of the circumstances is just that: the total of all of the circumstances known to the law-enforcement officer as of the time the officer concludes that the "critical mass" of probable cause has been reached. Just as the officer is entitled to draw upon all of his training and experience in making that determination, going back perhaps many years, the officer may also appropriately consider all information, occurrences, and circumstances he has heard or seen relevant to the decision to search, subject only to various limiting principles that have been established by the caselaw, such as lack of reliability, and remoteness in time, of the information.
Here, Martin was aware of "numerous, numerous complaints" concerning drug activity at Grand Central Station, including specifically sales and purchases of Ecstasy. The officers previously had "made cases" involving Ecstasy transactions inside Grand Central Station. Martin was experienced in detecting the types of hand motions associated with person-to-person drug transfers. All of this background knowledge was legitimately included in his calculus of probable cause. He then witnessed a continuum of activities by Adkinson that culminated in, but did not begin with, his interaction with Kelley. Kelley's own actions commencing then were not the genesis of the body of circumstances Martin could consider in assessing the probability implications of the "totality" of relevant circumstances. Rather, he was entitled to take into account all of the events leading up to Kelley's search, including those involving only Adkinson.
When we independently survey the totality of those circumstances, we conclude that the trial judge had before him, in the record as structured, sufficient information from which he could conclude that probable cause, coincident with exigent circumstances, existed as of the time Martin grabbed Kelley's hand, so as to render that search reasonable under the Fourth Amendment.
Therefore, the Court of Criminal Appeals correctly affirmed the trial judge's denial of the motion to suppress, and the *726 judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
MOORE, C.J., and LYONS, BROWN, WOODALL, and STUART, JJ., concur.
HOUSTON and SEE, JJ., concur specially.
JOHNSTONE, J., dissents.
HOUSTON, Justice (concurring specially).
I concur.
The grounds for the petition for a writ of certiorari are:
"[T]he Court of Criminal Appeals' decision is in direct contradiction of all the concepts related to unreasonable search and seizure, as well as the protections of the Fourth Amendment to the Constitution of the United States."

(Emphasis added.) It then alleges conflict with the following holding in Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961): "All evidence obtained by searches and seizures in violation of the Constitution of the United States is ... inadmissible in a state court." (Emphasis added.)
The other conflict alleged in the petition did not in any way allege that the search or seizure was in violation of the Constitution of the State of Alabama.
I concur with the majority opinion because it addresses only the law of search and seizure as it relates to the Constitution of the United States and not as it relates to the Constitution of the State of Alabama, even though the petition alleges that "the Court of Criminal Appeals' decision is in direct contradiction of all the concepts related to unreasonable search and seizure."
Article I, § 5, Alabama Constitution of 1901, provides:
"That the people shall be secure in their persons, houses, papers and possessions from unreasonable seizure or searches, and that no warrants shall issue to search any place or to seize any person or thing without probable cause, supported by oath or affirmation."
(Emphasis added.)
I am not convinced that Art. I, § 5, Ala. Const. of 1901, affords only the rights against unlawful search and seizures that are afforded by the Fourth Amendment to the United States Constitution.
SEE, Justice (concurring specially).
I concur that there was probable cause for Martin's warrantless search and seizure of Kelley. The majority opinion finds probable cause by considering Martin's testimony both at the preliminary hearing and at the suppression hearing. I find sufficient evidence of probable cause in Martin's testimony at the suppression hearing considered alone.
JOHNSTONE, Justice (dissenting).
I respectfully dissent. The United States Supreme Court has, perhaps unwittingly, declared conflicting, mutually exclusive standards for judging whether probable cause to search exists; and the main opinion has chosen the one of these two standards that violates the defendant's due process rights and that also violates established principles governing the admissibility and consideration of expert testimony. I respectfully submit that we should choose and follow the other of the two standards, the one which preserves due process and honors established rules of evidence.
One of the two standards, in my opinion the correct one, is the objective standard of the person of reasonable caution. "[I]n *727 making that assessment it is imperative that the facts be judged against an objective standard: would facts available to the officer at the moment of the seizure or the search `warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)) (internal quotation marks omitted).
The other of the two standards, in my opinion the incorrect one, is deference to the "police officer view[ing] the facts through the lens of his police experience and expertise." Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). "[A] police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference." Id. (Emphasis added.)
The conflict between these two standards is that the "police officer view[ing] the facts through the lens of his police experience and expertise," id., is neither objective nor reasonably cautious. The case before us supplies apt examples.
"Objective" means "involving or deriving from sense perception or experience with actual objects, conditions or phenomena." Merriam-Webster's Collegiate Dictionary 801 (10th ed.1997). The police officer in this case, through "the lens of his police experience and expertise," "views" every Tic-Tac box and every matchbox as a likely repository of illegal drugs. Of course, of the tens of millions of Tic-Tac boxes and matchboxes manufactured and sold by the Tic-Tac and matchbox companies and carried by members of the general public, most contain Tic-Tacs and matches, respectively. Indeed in bars like Grand Central Station, where the patrons typically want to attract each other and light their own and each other's cigarettes, these boxes usually contain Tic-Tacs and matches, respectively.
When a narcotics police officer does seize a small quantity of an illegal drug, it will likely be inside a small container, perhaps a Tic-Tac box or a matchbox. But this "police experience" does not support an inference that all Tic-Tac boxes and matchboxes, or even a significant percentage of them, contain illegal drugs any more than the observation that all platypuses are mammals supports the inference that all mammals, or even a significant percentage of them, are platypuses. Rather, the police officer is simply indulging the classic and patently unobjective fallacy that, because all members of a subset are also members of the main set, all members of the main set must be members of the subset. The same analysis applies equally to all of the acts and activities the officer cited as support for his claim to probable cause in the case before us.
And why does the police officer indulge this classic fallacy? Because all of the incentives of his mission militate against his exercising "reasonable caution."
While I have not found a definition for "reasonable caution" in the context of the law of probable cause, the term must mean reasonable deference to the likelihood that the conduct or object is innocent. Yet the goal of the narcotics officer on a narcotics mission to seize illegal drugs requires that the officer find probable cause against *728 enough citizens to conduct enough searches eventually to find and to seize some illegal drugs. Every incentive militates in favor of relying on mere possibilities of guilt instead of deferring to reasonable likelihoods of innocence. The officer will not receive any promotions, awards, or kudos for deferring to the likelihoods of innocence.
Thus the two standards declared by the United States Supreme Court, the objective standard of the person of reasonable caution on the one hand and deference to the "police officer view[ing] the facts through the lens of his police experience and expertise" on the other hand, are not reconcilable in any realistic sense. The main opinion in the case before us relies on the second of these standards, deference to the police officer. It is wrong for two cardinal reasons.
First, the standard of deference to the police officer deprives the defendant of due process of law. To the extent that the trial judge defers to the inferences of the police officer, the defendant's case is being judged by the police officer.
"It is elementary that a fair trial in a fair tribunal is a basic requirement of due process. A necessary component of a fair trial is an impartial judge."
Weiss v. United States, 510 U.S. 163, 177, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) (internal citation and quotation marks omitted).
"Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.
"... A situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him...."
Tumey v. Ohio, 273 U.S. 510, 532-34, 47 S.Ct. 437, 71 L.Ed. 749 (1927). The police officer is naturally biased in favor of finding probable cause. To the extent that the trial judge defers to the police officer, the trial judge inflicts this bias on the defendant and deprives him or her of due process of law.
This problem is exacerbated by the unverifiability of the police officer's testimony to acts and activities officers typically cite and courts typically accept as support for probable cause. After an officer searches a citizen and finds illegal drugs, the officer can, usually without likelihood of any effective contradiction, fabricate or imagine through his "lens" any number of movements, gestures, glances, acts, and actions to characterize as "furtive" or otherwise typical of or consistent with drug possession or transfer. In the case before us, for example, the officer testified at the suppression hearing that, from his balcony seat across the bar from the men's restroom, he saw Clint Adkinson pass something to another man in exchange for money after Adkinson and the other man had entered the restroom and before the closing door blocked the view. At the preliminary hearing, which preceded the suppression hearing by some months, the officer testified only:
"We had noticed [Adkinson] going to the bathroom that was just down from where we were at, maybe 15 or 20 feet from where we were at. He went into the bathroom with another guy. Shortly after they went into the bathroom, the other guy came out and nodded his head to some other guy, who we didn't know. And we still don't know the guy that went into the bathroom with [Adkinson], but he nodded his head [to the other *729 unknown man] and them two guys (the two unknown men) walked on down stairs. So, we kind of thought that there might have been a deal taking place."

(C.R. 42, emphasis added.) Although this testimony, ostensibly the truth, the whole truth, and nothing but the truth on this topic from the preliminary hearing, was before the trial judge for the suppression hearing, he accepted the additional "facts," supplied by the officer's lensmanship, to the effect that the officer observed an actual exchange of something for money inside the bathroom.
The second reason the standard of deference to the police officer is wrong is that deference to his "expertise" violates established principles governing expert testimony. Rule 702, Ala. R. Evid., reads:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
While the smell or appearance of certain narcotics may be a topic of "specialized knowledge," hardly any of the other bases police officers typically cite for their claim to probable cause are topics of either "scientific, technical, or other specialized knowledge." What Tic-Tac boxes, matchboxes, and film canisters ordinarily contain, can contain, and sometimes contain is hardly "scientific, technical, or specialized knowledge." Discussing the officer in this case, the main opinion also recites:
"On some occasions he had worked undercover, actually `buying the dope from people,' which had given him personal knowledge about `how those type transactions take place.' In that regard, he had learned that `the biggest part is just watching peoples' hands and watch what their hands do, where there hands go... passing the dope or the money.'"
870 So.2d at 715. While the officer's testimony to the activities of "peoples' hands" may be the product of his attention to this topic, it is not the product of "scientific, technical, or other specialized knowledge."
Moreover, mandatory deference to the police officer's "expertise" is an aberration in the otherwise dominant caselaw to the effect that the trier of fact need not accept the opinions or conclusions of expert witnesses. "[O]pinions testified to by an expert are certainly not binding on the court." Mopkins v. St. Louis Die Casting Corp., 569 F.2d 454, 455 (8th Cir.1978). "[T]he judge is not bound to accept the opinion of any expert witness or group of expert witnesses." United States v. Ecker, 543 F.2d 178, 184 (D.C.App.1976). "[A] trial court as fact finder `need not be bound by expert testimony even if all of the witnesses are presented only by one side.'" United States v. Esle, 743 F.2d 1465, 1474 (11th Cir.1984) (quoting United States v. Pitts, 428 F.2d 534, 536 (5th Cir.1970)). Accord United States v. Bautista-Avila, 6 F.3d 1360, 1366 (9th Cir. 1993); United States v. Glover, 596 F.2d 857, 865 (9th Cir.1979); Bordas & Co. v. Pizarro Serrano, 314 F.2d 291, 293 (1st Cir.1963); Phillips v. Parke, Davis & Co., 869 F.2d 407, 409 (8th Cir.1989); Fraser & Wise, P.C. v. Primarily Primates, Inc., 966 F.Supp. 63, 78 (D.Mass.1996); Arico v. Cie De Navegacion Transoceanique, 409 F.2d 1002, 1003 (2d Cir.1969); Hamling v. United States, 418 U.S. 87, 100, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); and United States v. Locascio, 6 F.3d 924, 937 (2d Cir.1993). See Alabama Pattern Jury Instructions: Civil 15.09 (2d ed.1993).
In the case before us, the testimony of the officer, even if true, to the series of acts and actions by Clint and the defendant, *730 if considered with objectiveness and reasonable caution, supports only the conclusion that, before the search, possible cause, not probable cause, existed to believe that the defendant possessed an illegal drug. The United States Supreme Court has confronted us with two conflicting standards. We can neither faithfully follow both nor reconcile the two. Thus, for the reasons I have explained, I respectfully submit that we should choose and follow the objective standard of the person of reasonable caution instead of the standard of deference to the police officer and that we should, accordingly, hold this search and seizure illegal and reverse the judgment and remand this cause for retrial or other appropriate proceedings.
NOTES
[1] "`Shot house' is a term used by the police to describe a private residence where illegal whiskey is sold by the shot." Ex parte Tucker, 667 So.2d at 1342 n. 1.
[2] It must be remembered with respect to this express characterization by Martin of the nature and purpose of Adkinson's handling of the container that the characterization was placed before the trial judge without objection, with no motion to exclude and no later impeachment. We recognize, of course, that because of the interaction of Rules 5.3 and 15.6(a), Ala. R.Crim. P., and Rule 104, Ala. R. Evid., the trial court in the suppression hearing was not bound by the rules of evidence in making its determination of the legal propriety of the search. Nonetheless, we must deal with the state of the record as it existed before the trial court.