894 So.2d 773 (2003)
Brian SHAVER
v.
STATE of Alabama.
CR-02-0773.
Court of Criminal Appeals of Alabama.
August 29, 2003.
Rehearing Denied October 24, 2003.
Nathan P. Johnson, Sheffield, for appellant.
William H. Pryor, Jr., atty. gen., and Michael B. Billingsley, asst. atty. gen., for appellee.
WISE, Judge.
AFFIRMED BY UNPUBLISHED MEMORANDUM.
McMILLAN, P.J., concurs. BASCHAB, J., concurs in the result. SHAW, J., dissents, with opinion, which COBB, J., joins.
SHAW, Judge, dissenting.
I respectfully disagree with the conclusion in Part I of the unpublished memorandum that there was reasonable suspicion to justify the initial investigatory stop of Brian Shaver's vehicle and that, therefore, the trial court properly denied Shaver's motion to suppress.
My review of the record reveals the following: Chris Hargett, an investigator with the Franklin County Sheriff's Department, testified that on January 30, 2002, he was contacted by the Russellville Police Department and asked to assist with a vehicle that had been stopped on Highway 43. Investigator Hargett testified he was informed that the vehicle had been stopped *774 because it had left a nearby Wal-Mart discount store after the occupants had purchased a large quantity of pseudoephedrine. Investigator Hargett testified that Shaver was the driver of the vehicle and that his wife Joyce Shaver and Catherine Aaron were passengers in the vehicle. When he looked in the vehicle, he saw pseudoephedrine pills in plain view. Investigator Hargett said that the three were then arrested and advised of their Miranda[1] rights and that each then made a statement. After the arrest, Investigator Hargett said, he discovered in the trunk a bottle of "Heet," and dishes that were later determined to have been stolen from Wal Mart.
With respect to the initial stop of the vehicle, Investigator Hargett testified:
"Russellville [police were] at the Wal-Mart when the purchased [sic] several people in the vehicle had purchased several boxes of pseudoephedrine pills. Russellville had the vehicle stopped at Highway 43 out there at Kentucky Fried Chicken, and I arrived just shortly thereafter after they had it stopped.
"Basically the Russellville officer that stopped asked me to take, to do the case because they weren't real familiar with the new laws on methamphetamine, and so basically we got there and the pseudoephedrine pills were in plain view. We got each one out, individually out. I brought them back to my car and read them their rights and got statements from them."
(R. 28.) However, when the trial court asked whether "the vehicle was stopped as a result of a telephone call from Wal-Mart about them buying the pseudoephedrine" (as opposed to Russellville officers actually being present at the Wal-Mart store when the purchases were made), Investigator Hargett answered in the affirmative. (R. 29.) In fact, Investigator Hargett stated three times during the suppression hearing that the basis for the stop was a telephone call "from Wal-Mart" indicating that several boxes of pseudoephedrine pills had been purchased. (R. 29, 30, 31.)
On cross-examination of Investigator Hargett, the following occurred:
"[Joyce Shaver's counsel]: Now, you did not, or Franklin County sheriff's department did not receive that phone call, correct?
"[Investigator Hargett]: Correct.
"[Joyce Shaver's counsel]: You were not involved in any capacity receiving that phone call?
"[Investigator Hargett]: Not the phone call, no.
"[Joyce Shaver's counsel]: You could not testify as to who that phone call came from?

"[Investigator Hargett]: No.

"[Joyce Shaver's counsel]: You could not testify as to the reliability of that person that gave the tip?

"[Investigator Hargett]: No.

"[Joyce Shaver's counsel]: You did not pull the vehicle over?
"[Investigator Hargett]: No, sir.
"[Joyce Shaver's counsel]: And do you know who pulled the vehicle over?
"[Investigator Hargett]: I believe it was Harold Washington from Russellville Police Department.
"[Joyce Shaver's counsel]: Okay. And you couldn't testify as to what reasonable suspicion that Harold Washington used to pull over the vehicle?
"[Investigator Hargett]: Other than the phone call from Wal-Mart.
"[Joyce Shaver's counsel]: You heard that hearsay evidence?

*775 "[Investigator Hargett]: Well, I heard them on the radio giving out the information.
"....
"[Joyce Shaver's counsel]: And to the best of your knowledge there would be other than what you said you heard over the radio, there is no evidence that you can offer as to the stopping of the vehicle and what basis was used, correct?
"[Investigator Hargett]: Well, the basis that was used that I'm aware of is the phone call from Wal-Mart.
"[Joyce Shaver's counsel]: Okay. Nothing else that you're aware of?
"[Investigator Hargett]: Nothing else.
"[Joyce Shaver's counsel]: And you could not and you don't know anything about that phone call other than what you heard come over the radio?
"[Investigator Hargett]: Correct."
(R. 30-31.)(Emphasis added.)
In State v. White, 854 So.2d 636 (Ala.Crim.App.2003), this Court addressed the difference between an "anonymous tip" and a tip from a reliable informant for purposes of establishing reasonable suspicion for a Terry[2] stop:
"`The United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), held that "a police officer may, in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22, 88 S.Ct. at 1880. The standard for allowing a Terry stop is whether there is a reasonable suspicion that "the person being stopped has engaged in some type of criminal activity." Webb v. State, 500 So.2d 1280, 1281 (Ala.Crim.App.), cert. denied, 500 So.2d 1282 (Ala.1986).'
"Ex parte Carpenter, 592 So.2d 627, 629 (Ala.1991).
"`It is well settled that "[i]nformation provided by a reliable informant can provide the reasonable suspicion required to justify a Terry stop." Lamar v. State, 578 So.2d [1382] at 1385 [(Ala.Crim.App.1991),] and authorities cited therein. Whether the information provided by an informant in a particular case is sufficient to establish reasonable suspicion is to be determined by applying the "totality of the circumstances" test set out in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Alabama v. White, 496 U.S. [325] at 330-31, 110 S.Ct. [2412] at 2416[, 110 L.Ed.2d 301 (1990)]. Under this test, which was formulated in the context of probable cause, the informant's "veracity," "reliability," and "basis of knowledge" are "highly relevant" factors to be considered. Gates, 462 U.S. at 230, 103 S.Ct. at 2328. However, because reasonable suspicion is a lower standard, there need not be as strong a showing with regard to these factors as is required for the establishment of probable cause, Alabama v. White, 496 U.S. at 330-31, 110 S.Ct. at 2415.'
"Wilsher v. State, 611 So.2d 1175, 1179 (Ala.Crim.App.1992).
"....
"`Because the veracity of the person giving [an] anonymous tip is "by hypothesis largely unknown, and unknowable," Illinois v. Gates, 462 U.S. [213] at 237, 103 S.Ct. [2317] at 2331[, 76 L.Ed.2d 527 (1983)], and because ordinary citizens do not generally provide *776 extensive recitations of the basis of their everyday observations, an anonymous tip, without more, seldom demonstrates an informant's reliability or the basis of the informant's knowledge.'
"Ex parte Barnette, 624 So.2d 507, 508 (Ala.1993). However, in Alabama v. White, 496 U.S. 325[, 110 S.Ct. 2412, 110 L.Ed.2d 301] (1990), the United States Supreme Court held that a tip from an anonymous informant could provide reasonable suspicion for an investigatory stop under Terry v. Ohio, 392 U.S. 1[, 88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), if the tip was sufficiently corroborated through independent police work. The Court stated:
"`Illinois v. Gates, 462 U.S. 213[, 103 S.Ct. 2317, 76 L.Ed.2d 527] (1983), dealt with an anonymous tip in the probable-cause context. The Court there abandoned the "two-pronged test" of Aguilar v. Texas, 378 U.S. 108 [, 84 S.Ct. 1509, 12 L.Ed.2d 723] (1964), and Spinelli v. United States, 393 U.S. 410[, 89 S.Ct. 584, 21 L.Ed.2d 637] (1969), in favor of a "totality of the circumstances" approach to determining whether an informant's tip establishes probable cause. Gates made clear, however, that those factors that had been considered critical under Aguilar and Spinelli  an informant's "veracity," "reliability," and "basis of knowledge"  remain "highly relevant in determining the value of his report." 462 U.S., at 230[, 103 S.Ct. 2317]. These factors are also relevant in the reasonable-suspicion context, although allowance must be made in applying them for the lesser showing required to meet that standard.
"`The opinion in Gates recognized that an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is "by hypothesis largely unknown, and unknowable." Id., at 237[, 103 S.Ct. 2317]. This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for a Terry[ v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] stop. But the tip in Gates was not an exception to the general rule, and the anonymous tip in this case is like the one in Gates: "[It] provides virtually nothing from which one might conclude that [the caller] is either honest or his information reliable; likewise, the [tip] gives absolutely no indication of the basis for the [caller's] predictions regarding [White's] criminal activities." 462 U.S., at 227[, 103 S.Ct. 2317]. By requiring "[s]omething more," as Gates did, ibid., we merely apply what we said in Adams[ v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)]: "Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized," 407 U.S. at 147[, 92 S.Ct. 1921]. Simply put, a tip such as this one, standing alone, would not "`warrant a man of reasonable caution in the belief' that [a stop] was appropriate." Terry, supra, quoting Carroll v. United States, 267 U.S. 132, 162[, 45 S.Ct. 280, 69 L.Ed. 543] (1925).
"`As there was in Gates, however, in this case there is more than the tip itself. The tip was not as detailed, and the corroboration was not as complete, as in Gates, but the required degree of suspicion was likewise not *777 as high. We discussed the difference in the two standards last Term in United States v. Sokolow, 490 U.S. 1, 7[, 109 S.Ct. 1581, 104 L.Ed.2d 1] (1989):
"`"The officer [making a Terry stop] ... must be able to articulate something more than an `inchoate and unparticularized suspicion or "hunch."' [Terry, 392 U.S.] at 27[, 88 S.Ct. 1868]. The Fourth Amendment requires `some minimal level of objective justification' for making the stop. INS v. Delgado, 466 U.S. 210, 217[, 104 S.Ct. 1758, 80 L.Ed.2d 247] (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means `a fair probability that contraband or evidence of a crime will be found,' [Gates, 462 U.S., at 238, 103 S.Ct. 2317], and the level of suspicion required for a Terry stop is obviously less demanding than for probable cause."
"`Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Adams v. Williams, supra, demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a Terry stop. 407 U.S., at 147[, 92 S.Ct. 1921]. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors  quantity and quality  are considered in the "totality of the circumstances  the whole picture," United States v. Cortez, 449 U.S. 411, 417[, 101 S.Ct. 690, 66 L.Ed.2d 621] (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. The Gates Court applied its totality-of-the-circumstances approach in this manner, taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work. The same approach applies in the reasonable-suspicion context, the only difference being the level of suspicion that must be established. Contrary to the court below, we conclude that when the officers stopped respondent, the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that respondent was engaged in criminal activity and that the investigative stop therefore did not violate the Fourth Amendment.
"`....
"`We think it also important that, as in Gates, "the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." Id., at 245[, 88 S.Ct. 1868]. The fact that the officers found a car precisely *778 matching the caller's description in front of the 235 building is an example of the former. Anyone could have "predicted" that fact because it was a condition presumably existing at the time of the call. What was important was the caller's ability to predict respondent's future behavior, because it demonstrated inside information  a special familiarity with respondent's affairs. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel. Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities. See ibid. When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.
"`....'
"496 U.S. at 328-32[, 110 S.Ct. 2412]...."
854 So.2d at 638-42 (some emphasis added).
I recognize that there is support in other jurisdictions for the State's position that a telephone call from an employee of a store may, in certain circumstances, provide reasonable suspicion to justify a Terry stop of a vehicle. For example, in State v. Vereb, 643 N.W.2d 342 (Minn.Ct.App.2002), the evidence indicated that a Wal-Mart employee had telephoned the police and informed them that two men had purchased a large number of pills containing cold medication and that the men had made several trips into the store to purchase the pills. When the police arrived at the Wal-Mart store, the employee who had telephoned them informed the officer that the men had just left in a vehicle and provided information about the direction in which the vehicle had gone; the employee also rode with the police to locate the vehicle. When the employee spotted the vehicle and the police officer attempted to follow it, the vehicle began to pull away from the police vehicle and reached speeds in excess of 75 miles per hour. Another police officer was able to eventually stop the vehicle and over 30 boxes of cold-medication pills were found in the vehicle. Although the speeding violation was sufficient by itself to establish probable cause to stop the vehicle, the Minnesota Court of Appeals also held that there was reasonable suspicion to conduct a Terry stop of the vehicle based on the information received from the Wal-Mart employee. Compare State v. Bergerson, 659 N.W.2d 791 (Minn.Ct.App.2003)(distinguishing Vereb and holding that a telephone call from an employee of a hardware store where the appellant had purchased rubber tubing and acetone, without more, was not sufficient to establish reasonable suspicion for a Terry stop of the appellant's vehicle).
Similarly, in State v. Bulington, 783 N.E.2d 338 (Ind.Ct.App.2003), the evidence indicated that Cassie Oakley, an employee at a Meijer Superstore who had been advised by Meijer's loss-prevention personnel to be aware of activity involving decongestants or other precursor chemicals that could be used in the manufacture of methamphetamine, observed two individuals standing near a display of nasal decongestant. The State presented testimony that a local drug task force had requested to be notified of anyone who purchased, among other things, three or more boxes of cold medicine. The evidence indicated that Dan Majors, Meijer's *779 in-store detective, observed the two individuals select three boxes each of ephedrine, purchase the boxes at different checkout counters, act as if they did not know each other when leaving the store, and then get in the same vehicle and remove the pills from the boxes and put them in shopping bags. Majors telephoned the police and alerted them to the activities, and an officer arrived just as the suspects' vehicle was leaving the parking lot of the store. The officer confirmed, via the dispatcher who was speaking with Majors, which vehicle the suspects were in, and then initiated the stop of the vehicle. Bulington was driving the vehicle and the officer subsequently discovered over 100 pills containing ephedrine in the vehicle. In holding that the trial court had erroneously granted Bulington's motion to suppress, the Indiana Court of Appeals noted specific testimony that had been presented at the suppression hearing, such as the testimony that the local drug task force had requested Meijer employees to provide them with information about activity involving purchases of precursor chemicals, the testimony of both employees from the Meijer Superstore that had been involved, and the officer's rendition of the information that he had been provided by the dispatcher while he was en route to the store and in verifying that he was about to stop the correct vehicle.
However, here, unlike Vereb and Bulington, and contrary to the conclusion in the unpublished memorandum, none of the testimony presented at the suppression hearing indicated that the telephone call that resulted in the stop of Shaver's vehicle came from a Wal-Mart employee. As noted above, Investigator Hargett testified three times during the hearing that the call came "from Wal-Mart"; however, he never testified that the call came from an employee of Wal-Mart. In fact, Investigator Hargett testified that he did not know who the call had come from. Based on Investigator Hargett's testimony, the call could have come from a customer of Wal-Mart or even a passerby, and not from an employee.
However, even assuming, as the unpublished memorandum does, that the telephone call was placed by an employee of Wal-Mart, unlike Bulington, and to a large extent Vereb, no testimony about any Wal-Mart policies regarding the purchase of products containing precursor chemicals was presented at the suppression hearing. While there are many cases from various jurisdictions referencing the laudable policies of retailers attempting to limit the amount of various precursor chemicals that one can purchase, there was no testimony in this case that the maximum number of pills containing pseudoephedrine that could be purchased under Wal-Mart's policy was three boxes,[3] as the memorandum states, and there was no evidence indicating that Wal-Mart, either in general or the Russellville Wal-Mart in particular,[4] had a policy of working with local law enforcement to curtail the purchase of large quantities of precursor chemicals that could be used to manufacture methamphetamine.[5] *780 Simply put, the State failed to present any evidence tending to establish that the caller was a reliable informant. Therefore, I believe that the tip in this case, even assuming the unidentified caller was an employee of Wal-Mart, must be viewed as coming from an anonymous tipster.
"[A]n anonymous tip can provide the reasonable suspicion necessary for an investigatory stop, if the tip is sufficiently corroborated by independent police investigation." Ex parte Barnette, 624 So.2d 507, 508 (Ala.1993). However, my review of the record indicates, contrary to the conclusion, that the State failed to present any evidence indicating that any of the information provided by the caller had been corroborated. In fact, no testimony was presented indicating what information was actually provided by the caller. Although the trial court stated in its order, and the memorandum assumes, that the unidentified caller informed police that he or she had seen the three defendants purchase the pills containing pseudoephedrine and leave the store together in a vehicle with an out-of-county license tag, no evidence of that was actually presented at the suppression hearing. Investigator Hargett, the only person to testify at the suppression hearing, testified that the Russellville Police Department had stopped the vehicle because it had received a telephone call informing it that the occupants had purchased a large amount of pseudoephedrine at the local Wal-Mart  that was the extent of his testimony regarding the tip. Investigator Hargett did not testify that the caller had indicated the actual quantity of pseudoephedrine that had been purchased or that he or she had followed the individuals into the parking lot and seen them get in a vehicle with an out-of-county license tag.
However, even assuming that the police were provided a description of the vehicle, based on the only testimony about the tip that was presented at the suppression hearing, the anonymous tip provided nothing from which one might conclude that the caller was honest or that the information was reliable; the tip gave absolutely no indication of the basis for the caller's knowledge; and his or her tip was not corroborated by independent police investigation, nor did it even contain any information, such as a prediction of the defendants' future actions, that could have been corroborated.
Based on the testimony presented at the suppression hearing, I believe that the uncorroborated anonymous tip that the defendants had purchased a large quantity of pseudoephedrine from Wal-Mart was not sufficient to establish reasonable suspicion for a Terry stop of Shaver's vehicle.[6]
*781 I am aware that the materials needed to manufacture methamphetamine are readily available in most local grocery stores, hardware stores, drugstores, or discount stores, and I strongly support public and private cooperation in curtailing the unlawful manufacture, use, and distribution of methamphetamine and other illicit substances. However, that curtailment cannot come at the expense of a defendant's constitutional rights. The State has the burden, in a challenge to the legality of an investigatory stop, of establishing that the stop was indeed lawful. Here, the State failed to meet that burden.
I believe that Shaver's motions to suppress the evidence of the pills containing pseudoephedrine and the subsequent statement he made to police after the investigatory stop should have been granted, and I would reverse the judgment of the trial court on that ground. Therefore, I must respectfully dissent.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[3] The only testimony in this respect was Investigator Hargett's testimony that, in her statement to him after the initial traffic stop, Catherine Aaron told him that "Joyce [Shaver] told me to go inside and buy three boxes of Sudafed, and three was all you could buy." (R. 14.) There was no testimony indicating that Joyce Shaver's apparent belief that an individual could buy only three boxes of pills containing pseudoephedrine was, in fact, a policy of Wal-Mart.
[4] I do not believe that the fact that other stores, even some Wal-Mart stores, have such policies is proof that this particular Wal-Mart store had such a policy in place.
[5] I am aware that in State v. Odom, 872 So.2d 887 (Ala.Crim.App.2003), this Court noted that "Wal-Mart has the policy of notifying the police when customers purchase more than three boxes of cold medications." 872 So.2d at 889. However, in Odom, there was testimony from the police officer about the details of the appellant's purchases, as told to the officer by an off-duty officer who actually observed the appellant's purchases  the defendant went through the checkout line "several" times purchasing items that that officer had been trained to recognize could be used to manufacture methamphetamine. In that case, the testimony presented at the suppression hearing as included in the record on appeal was sufficient to support the trial court's finding that a reasonable suspicion, in fact, that probable cause, existed. Here, there is simply no such testimony in the record.
[6] I note that the memorandum states: "While Shaver's actions standing alone may have been innocent per se, the suspicious nature of Shaver's and his companions' making identical drug purchases to the maximum quantity allowed, taken together with the fact that all three were traveling in the same car from another county, and Shaver's and Aaron's sub sequent statements that the pseudoephedrine would ultimately be used to manufacture methamphetamine, gave Deputy Hargett reasonable suspicion to legally investigate the nature of Shaver's purchase as suggestive of illegal activity." (Emphasis added.) I do not agree that the statements given by the defendants after the stop of the vehicle can be used to justify the initial stop of the vehicle. See note 3.