Brian Shaver petitioned for a writ of certiorari from this Court to review the Court of Criminal Appeals' unpublished memorandum affirming the trial court's judgment convicting him, pursuant to a negotiated plea agreement, of the unlawful manufacture of a controlled substance in the second degree, a violation of § 13A-12-217, Ala. Code 1975. Shaver v. State,894 So.2d 773 (Ala.Crim.App. 2003). He was sentenced to three years' imprisonment; that sentence was split pursuant to the Split Sentence Act, § 15-18-8, Ala. Code 1975, and he was ordered to serve six months in jail, followed by three years' supervised probation and to pay all mandatory fines and court costs. At his guilty-plea hearing, Shaver reserved the right to appeal the issues of the propriety of the trial court's denial of his motion to suppress certain evidence and the constitutionality of §13A-12-217, Ala. Code 1975.
This Court granted Shaver's petition on January 12, 2004, to consider only the issue whether the trial court properly denied Shaver's motion to suppress the following evidence: pseudoephedrine[1] seized from his vehicle pursuant to a warrantless *Page 783 
stop and a statement he made to the arresting officer, admitting that he purchased the chemical with the knowledge that it would be used to manufacture the illegal drug methamphetamine. The Court of Criminal Appeals affirmed the trial court's ruling based on its conclusion that Shaver's vehicle was properly detained because the officer stopping the vehicle had a "reasonable suspicion" of criminal activity. Judge Shaw dissented from the Court of Criminal Appeals' unpublished memorandum affirmance, and Judge Cobb joined his writing. Shaver v. State, 894 So.2d at 773.
The unpublished memorandum describes the facts in the record as follows:
 "The record reveals that, on January 30, 2002, Shaver, his wife Joyce Lawler Shaver, and a friend, Catherine Aaron, stopped at a Wal-Mart [discount department] store in Russellville. While at the store, each of them bought multiple packages of an over-the-counter cold medication containing pseudoephedrine. A Wal-Mart employee became suspicious of the customers; the employee followed the three individuals into the parking lot where she, pursuant to established store policy, obtained the license plate number and a description of the vehicle in which the three were traveling.² She observed that the vehicle had an out-of-county tag. The Russellville Police Department was contacted by Wal-Mart personnel regarding the purchases, and the police department notified its patrol officers to be on the lookout for the Shaver vehicle. Officer Harold Washington of the Russellville Police Department spotted the vehicle and detained the occupants in the parking lot of a nearby Kentucky Fried Chicken restaurant, until Deputy Hargett of the Franklin County Sheriff's Department arrived. When Deputy Hargett arrived and walked over to the vehicle, he immediately noted pseudoephedrine tablets in plain view inside the vehicle. Based on Deputy Hargett's knowledge of the suspicious nature of the pseudoephedrine purchases via police radio dispatch, and statements made by the parties after the three were read their Miranda [v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),] rights, Deputy Hargett arrested Shaver and the two females and charged them with the possession of precursor substances with the intent to manufacture a controlled substance.
 "² Many retailers, due to increased awareness of incidents of illegal manufacture of methamphetamine, and in cooperation with law enforcement, have placed limits on the amount of pseudoephedrine hydrochloride-containing products a consumer may purchase at one time. Wal-Mart limits such purchases to a maximum of three packages per person, the amount that Shaver and his codefendants purchased. Any purchasers who appear to buy suspicious amounts or attempt to exceed the limit are reported to authorities, along with their license plate number."
The unpublished memorandum recounts the statement Shaver made after his arrest:
 "`Today me and Joyce Shaver and Catherine Aaron came to Russellville. We went to Wal-Mart and I went in and bought three boxes of pills and a tube of Carmex [brand medicated lip balm]. My wife and Catherine also bought three boxes of pills. We then were going on. I wasn't going to cook meth with these today, but sooner or later I'm sure that's what they would be used for, meth.'"
Aaron also gave a statement indicating that the pills might ultimately be used to make "meth." *Page 784 
The dissent supplied more facts, which are substantiated by our review of the record:
 "Chris Hargett, an investigator with the Franklin County Sheriff's Department, testified that on January 30, 2002, he was contacted by the Russellville Police Department and asked to assist with a vehicle that had been stopped on Highway 43. Investigator Hargett testified he was informed that the vehicle had been stopped because it had left a nearby Wal-Mart discount store after the occupants had purchased a large quantity of pseudoephedrine. Investigator Hargett testified that Shaver was the driver of the vehicle and that his wife Joyce Shaver and Catherine Aaron were passengers in the vehicle. When he looked in the vehicle, he saw pseudoephedrine pills in plain view. Investigator Hargett said that the three were then arrested and advised of their Miranda¹ rights and that each then made a statement. After the arrest, Investigator Hargett said, he discovered in the trunk a bottle of `Heet,' and dishes that were later determined to have been stolen from Wal-Mart.
 "With respect to the initial stop of the vehicle, Investigator Hargett testified:
 "`Russellville [police were] at the Wal-Mart when the purchased [sic] several people in the vehicle had purchased several boxes of pseudoephedrine pills. Russellville [police] had the vehicle stopped at Highway 43 out there at Kentucky Fried Chicken [restaurant], and I arrived just shortly thereafter after they had it stopped.
 "`Basically the Russellville officer that stopped asked me to take, to do the case because they weren't real familiar with the new laws on methamphetamine, and so basically we got there and the pseudoephedrine pills were in plain view. We got each one out, individually out. I brought them back to my car and read them their rights and got statements from them.'
 "However, when the trial court asked whether `the vehicle was stopped as a result of a telephone call from Wal-Mart about them buying the pseudoephedrine' (as opposed to Russellville officers actually being present at the Wal-Mart store when the purchases were made), Investigator Hargett answered in the affirmative. In fact, Investigator Hargett stated three times during the suppression hearing that the basis for the stop was a telephone call `from Wal-Mart' indicating that several boxes of pseudoephedrine pills had been purchased.
 "On cross-examination of Investigator Hargett, the following occurred:
 "`[Joyce Shaver's counsel]: Now, you did not, or Franklin County sheriff's department did not, receive that phone call, correct?
"`[Investigator Hargett]: Correct.
 "`[Joyce Shaver's counsel]: You were not involved in any capacity receiving that phone call?
"`[Investigator Hargett]: Not the phone call, no.
 "`[Joyce Shaver's counsel]: You could not testify as to who that phone call came from?
"`[Investigator Hargett]: No.
 "`[Joyce Shaver's counsel]: You could not testify as to the reliability of that person that gave the tip?
"`[Investigator Hargett]: No.
 "`[Joyce Shaver's counsel]: You did not pull the vehicle over?
"`[Investigator Hargett]: No, sir.
 "`[Joyce Shaver's counsel]: And do you know who pulled the vehicle over? *Page 785 
 "`[Investigator Hargett]: I believe it was Harold Washington from Russellville Police Department.
 "`[Joyce Shaver's counsel]: Okay. And you couldn't testify as to what reasonable suspicion that Harold Washington used to pull over the vehicle?
 "`[Investigator Hargett]: Other than the phone call from Wal-Mart.
 "`[Joyce Shaver's counsel]: You heard that hearsay evidence?
 "`[Investigator Hargett]: Well, I heard them on the radio giving out the information.
"`. . . .
 "`[Joyce Shaver's counsel]: And to the best of your knowledge there would be[,] other than what you said you heard over the radio, there is no evidence that you can offer as to the stopping of the vehicle and what basis was used, correct?
 "`[Investigator Hargett]: Well, the basis that was used that I'm aware of is the phone call from Wal-Mart.
 "`[Joyce Shaver's counsel]: Okay. Nothing else that you're aware of?
"`[Investigator Hargett]: Nothing else.
 "`[Joyce Shaver's counsel]: And you could not and you don't know anything about that phone call other than what you heard come over the radio?
"`[Investigator Hargett]: Correct.'
"(Emphasis added.)
 "¹ Miranda v. Arizona, 384 U.S. 436[, 86 S.Ct. 1602, 16 L.Ed.2d 694] (1966)."
894 So.2d at 773-75 (citations to the record omitted).
Judge Shaw's dissent points out that Deputy Chris Hargett with the Franklin County Sheriff's Department was the only person to testify at the suppression hearing.
The unpublished memorandum applied the following rationale in concluding that the officers' stop and detention of Shaver's vehicle and its occupants was lawful:
 "An officer can stop briefly and detain a person, even where there is no traffic violation, if he has a reasonable suspicion, supported by articulable facts, that there is involvement in some other criminal activity justifying further detention for investigatory purposes under Terry v. Ohio, 392 U.S. 1[, 88 S.Ct. 1868, 20 L.Ed.2d 889] (1968).
 "`"Reasonable suspicion is a less demanding standard than probable cause." Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301
(1990). However, reasonable suspicion exists only if the officer has "specific, particularized, and articulable reasons indicating that the person [stopped] may be involved in criminal activity," Hickman v. State, 548 So.2d 1077, 1080
(Ala.Crim.App. 1989). "To determine whether reasonable suspicion existed for a particular stop, the totality of the circumstances, as known to the officer at the inception of the stop, [or, in this case, at the time of the continued detention,] must be considered." Arnold v. State, 601 So.2d 145, 149
(Ala.Crim.App. 1992) (emphasis added [in Washington]). Accord Lamar v. State, 578 So.2d 1382, 1385 (Ala.Crim.App.), cert. denied, 596 So.2d 659 (Ala. 1991).'
 "State v. Washington, 623 So.2d 392, 395-96
(Ala.Crim.App. 1993).
 "Deputy Hargett's testimony at the suppression hearing clearly established that he had factual information received from the Wal-Mart employee via the *Page 786 
Russellville Police Department to detain Shaver and effect a non-custodial investigation based on the suspicious purchases by Shaver and his companions of the maximum amount of pseudoephedrine-containing pills allowed under Wal-Mart policy. Deputy Hargett testified that Shaver and his companions were traveling in the same car with an out-of-county tag. The totality of the circumstances gave Deputy Hargett reasonable suspicion, at the time of the stop, to investigate Shaver's purchase. `A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct.' United States v. Arvizu, 534 U.S. 266, 277[, 122 S.Ct. 744, 151 L.Ed.2d 740] (2002). While Shaver's actions standing alone may have been innocent per se, the suspicious nature of Shaver's and his companions' making identical drug purchases to the maximum quantity allowed, taken together with the fact that all three were traveling in the same car from another county, and Shaver and Aaron's subsequent statements that the pseudoephedrine would ultimately be used to manufacture methamphetamine, gave Deputy Hargett reasonable suspicion to legally investigate the nature of Shaver's purchase as suggestive of illegal activity.
 "In Alabama v. White, 496 U.S. 325[, 110 S.Ct. 2412, 110 L.Ed.2d 301] (1990), the United States Supreme Court sustained a Terry stop undertaken on the basis of an anonymous tip, as corroborated by independent police work. The Court reasoned that although the anonymous tip standing alone lacked the necessary indicia of reliability, the totality of the circumstances demonstrated that significant aspects of the informant's story were sufficiently corroborated by the police to furnish reasonable suspicion. Under either analysis, the trial court did not err in the denial of Shaver's motion to suppress."
The point made by Judge Shaw's dissent, which we find dispositive, is that the only basis the police had for detaining Shaver's vehicle, established by Deputy Hargett's testimony, was a telephone call from an unknown individual who was purportedly calling from the Wal-Mart discount department store at which the pseudoephedrine had been purchased. The record does not supply any information concerning the telephone call to the police from the Wal-Mart store other than Deputy Hargett's testimony that he heard the Russellville police officers giving information about a telephone call they had received from Wal-Mart. The transcript of the suppression hearing contains no evidence to support the conclusion that the caller was in any way reliable. For example, contrary to the recitations in the unpublished memorandum, there is no evidentiary basis from which to infer that the telephone caller was a Wal-Mart employee, or even that the caller was a "she," or that the caller had any direct knowledge of what Shaver had purchased at Wal-Mart. Deputy Hargett testified to no specifics concerning the information conveyed by the Wal-Mart caller, such as whether the caller supplied any description of Shaver or a member of his party, whether the caller described Shaver's vehicle, or whether the caller supplied any information with respect to the amount of pills containing pseudoephedrine that had been purchased. In addition, Judge Shaw's dissent correctly notes:
 "[N]o testimony about any Wal-Mart policies regarding the purchase of products containing precursor chemicals was presented at the suppression hearing. While there are many cases from various jurisdictions referencing the laudable policies of retailers attempting to limit the amount of various precursor *Page 787 
chemicals that one can purchase, there was no testimony in this case that the maximum number of pills containing pseudoephedrine that could be purchased under Wal-Mart's policy was three boxes,³ as the memorandum states, and there was no evidence indicating that Wal-Mart, either in general or the Russellville Wal-Mart in particular,[4] had a policy of working with local law enforcement to curtail the purchase of large quantities of precursor chemicals that could be used to manufacture methamphetamine.[5]
 "³The only testimony in this respect was Investigator Hargett's testimony that, in her statement to him after the initial traffic stop, Catherine Aaron told him that `Joyce [Shaver] told me to go inside and buy three boxes of Sudafed, and three was all you could buy.' There was no testimony indicating that Joyce Shaver's apparent belief that an individual could buy only three boxes of pills containing pseudoephedrine was, in fact, a policy of Wal-Mart.
 "[4]I do not believe that the fact that other stores, even some Wal-Mart stores, have such policies is proof that this particular Wal-Mart store had such a policy in place.
 "[5]I am aware that in State v. Odom, 872 So.2d 887 (Ala.Crim.App. 2003), this Court noted that `Wal-Mart has the policy of notifying the police when customers purchase more than three boxes of cold medications.' 872 So.2d at 889. However, in Odom, there was testimony from the police officer about the details of the appellant's purchases, as told to the officer by an off-duty officer who actually observed the appellant's purchases — the defendant went through the checkout line `several' times purchasing items that that officer had been trained to recognize could be used to manufacture methamphetamine. In that case, the testimony presented at the suppression hearing as included in the record on appeal was sufficient to support the trial court's finding that a reasonable suspicion, in fact, that probable cause, existed. Here, there is simply no such testimony in the record."
894 So.2d at 779-80 (citations to the record omitted).
Moreover, for all that is shown in the record, Shaver's vehicle was stopped as the result of a telephone call to the police from the Wal-Mart store without any intervening police investigation; there is no indication in the record that the police did anything to corroborate the information given in the telephone call from Wal-Mart before stopping Shaver's vehicle. It was only after the vehicle had been detained that Deputy Hargett arrived and saw the packages of pills containing pseudoephedrine in "plain view" in the vehicle. We are therefore left to determine whether the evidence in the record concerning the telephone call from the Wal-Mart store where the purchase of pseudoephedrine was made was sufficient to establish the necessary "reasonable suspicion" for law-enforcement officers to stop and detain Shaver's vehicle. As Judge Shaw's dissent notes, the applicable law on the distinction between a tip from a reliable informant and an anonymous tip for the purpose of establishing reasonable suspicion for an investigatory stop is discussed in State v. White,854 So.2d 636 (Ala.Crim.App. 2003):
 "`The United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), held that "a police officer may, in appropriate circumstances and in an appropriate manner, approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22, 88 S.Ct. at 1880. The standard for allowing a Terry stop is whether there is a reasonable suspicion that "the person being stopped has engaged in some type of criminal activity." Webb v. State, 500 So.2d 1280, 1281 (Ala.Crim.App.), cert. denied, 500 So.2d 1282
(Ala. 1986).'
 "Ex parte Carpenter, 592 So.2d 627, 629 (Ala. 1991). *Page 788 
 "`It is well settled that "[i]nformation provided by a reliable informant can provide the reasonable suspicion required to justify a Terry stop." Lamar v. State, 578 So.2d [1382] at 1385 [(Ala.Crim.App. 1991),] and authorities cited therein. Whether the information provided by an informant in a particular case is sufficient to establish reasonable suspicion is to be determined by applying the "totality of the circumstances" test set out in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Alabama v. White, 496 U.S. [325] at 330-31, 110 S.Ct. [2412] at 2416[, 110 L.Ed.2d 301] [(1990)]. Under this test, which was formulated in the context of probable cause, the informant's "veracity," "reliability," and "basis of knowledge" are "highly relevant" factors to be considered. Gates, 462 U.S. at 230, 103 S.Ct. at 2328. However, because reasonable suspicion is a lower standard, there need not be as strong a showing with regard to these factors as is required for the establishment of probable cause, Alabama v. White, 496 U.S. at 330-31, 110 S.Ct. at 2415.'
"Wilsher v. State, 611 So.2d 1175, 1179 (Ala.Crim.App. 1992).
". . . .
 "`Because the veracity of the person giving [an] anonymous tip is "by hypothesis largely unknown, and unknowable," Illinois v. Gates, 462 U.S. [213] at 237, 103 S.Ct. [2317] at 2331[, 76 L.Ed.2d 527] [(1983)], and because ordinary citizens do not generally provide extensive recitations of the basis of their everyday observations, an anonymous tip, without more, seldom demonstrates an informant's reliability or the basis of the informant's knowledge.'
 "Ex parte Barnette, 624 So.2d 507, 508 (Ala. 1993). However, in Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the United States Supreme Court held that a tip from an anonymous informant could provide reasonable suspicion for an investigatory stop under Terry v. Ohio, 392 U.S. 1[, 88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), if the tip was sufficiently corroborated through independent police work. The Court stated:
 "`Illinois v. Gates, 462 U.S. 213[, 103 S.Ct. 2317, 76 L.Ed.2d 527] (1983), dealt with an anonymous tip in the probable-cause context. The Court there abandoned the "two-pronged test" of Aguilar v. Texas, 378 U.S. 108 [, 84 S.Ct. 1509, 12 L.Ed.2d 723] (1964), and Spinelli v. United States, 393 U.S. 410[, 89 S.Ct. 584, 21 L.Ed.2d 637] (1969), in favor of a "totality of the circumstances" approach to determining whether an informant's tip establishes probable cause. Gates made clear, however, that those factors that had been considered critical under Aguilar and Spinelli — an informant's "veracity," "reliability," and "basis of knowledge" — remain "highly relevant in determining the value of his report." 462 U.S., at 230[, 103 S.Ct. 2317]. These factors are also relevant in the reasonable-suspicion context, although allowance must be made in applying them for the lesser showing required to meet that standard.
 "`The opinion in Gates recognized that an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is "by hypothesis largely unknown, and unknowable." *Page 789 Id., at 237[, 103 S.Ct. 2317]. This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for a Terry [v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889
(1968),] stop. But the tip in Gates was not an exception to the general rule, and the anonymous tip in this case is like the one in Gates: "[It] provides virtually nothing from which one might conclude that [the caller] is either honest or his information reliable; likewise, the [tip] gives absolutely no indication of the basis for the [caller's] predictions regarding [White's] criminal activities." 462 U.S., at 227[, 103 S.Ct. 2317]. By requiring "[s]omething more," as Gates did, ibid., we merely apply what we said in Adams [v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)]: "Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized," 407 U.S. at 147[, 92 S.Ct. 1921]. Simply put, a tip such as this one, standing alone, would not "`warrant a man of reasonable caution in the belief' that [a stop] was appropriate." Terry, supra, quoting Carroll v. United States, 267 U.S. 132, 162[, 45 S.Ct. 280, 69 L.Ed. 543] (1925).
 "`As there was in Gates, however, in this case there is more than the tip itself. The tip was not as detailed, and the corroboration was not as complete, as in Gates, but the required degree of suspicion was likewise not as high. We discussed the difference in the two standards last Term in United States v. Sokolow, 490 U.S. 1, 7[, 109 S.Ct. 1581, 104 L.Ed.2d 1] (1989):
 "`"The officer [making a Terry stop] . . . must be able to articulate something more than an `inchoate and unparticularized suspicion or "hunch."' [Terry, 392 U.S.] at 27[, 88 S.Ct. 1868]. The Fourth Amendment requires `some minimal level of objective justification' for making the stop. INS v. Delgado, 466 U.S. 210, 217[, 104 S.Ct. 1758, 80 L.Ed.2d 247] (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means `a fair probability that contraband or evidence of a crime will be found,' [Gates, 462 U.S., at 238, 103 S.Ct. 2317], and the level of suspicion required for a Terry stop is obviously less demanding than for probable cause."
 "`Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Adams v. Williams, supra, demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a Terry stop. 407 U.S., at 147[, 92 S.Ct. 1921]. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors — quantity and quality — are considered in the "totality of the circumstances — the whole picture," United States v. Cortez, 449 U.S. 411, 417[, *Page 790 101 S.Ct. 690, 66 L.Ed.2d 621] (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. The Gates Court applied its totality-of-the-circumstances approach in this manner, taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work. The same approach applies in the reasonable-suspicion context, the only difference being the level of suspicion that must be established. Contrary to the court below, we conclude that when the officers stopped respondent, the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that respondent was engaged in criminal activity and that the investigative stop therefore did not violate the Fourth Amendment.
"`. . . .
 "`We think it also important that, as in Gates, "the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." Id., at 245[, 103 S.Ct. 2317]. The fact that the officers found a car precisely matching the caller's description in front of the 235 building is an example of the former. Anyone could have "predicted" that fact because it was a condition presumably existing at the time of the call. What was important was the caller's ability to predict respondent's future behavior, because it demonstrated inside information — a special familiarity with respondent's affairs. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel. Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities. See ibid. When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.
"`. . . .'
"496 U.S. at 328-32[, 110 S.Ct. 2412]. . . ."
854 So.2d at 638-42 (some emphasis original; some emphasis added).
The discussion in Judge Shaw's dissent of State v. Vereb,643 N.W.2d 342 (Minn.Ct.App. 2002); and State v. Bulington,783 N.E.2d 338 (Ind.Ct.App. 2003),[2] also appropriately *Page 791 
points out that in each of those cases, the telephone call supporting the finding that there was a reasonable suspicion for a Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889
(1968), investigatory stop had many more indicia of reliability than are present in this case. This Court discussed such indicia in Ex parte Kelley, 870 So.2d 711 (Ala. 2003), where we concluded that an experienced narcotics officer who observed a "furtive" transaction between the defendant and a known drug dealer at a bar that was known to be a place where drug transactions were common established sufficient reasonable suspicion for a Terry stop of the defendant. Thus, in Kelley
reasonable suspicion for a Terry stop was based upon the investigating officer's personal observation of a suspicious transaction by a known drug dealer in an area where drug transactions were common. In this case, the evidence before us shows only that the police received a telephone call from an unidentified person at a Wal-Mart discount store informing them that Shaver and the two women had purchased pills containing pseudoephedrine. Contrary to the view expressed in the unpublished memorandum, "Shaver and Aaron's subsequent statements that the pseudoephedrine would ultimately be used to manufacture methamphetamine" cannot be a factor supporting a finding of reasonable suspicion to make the vehicle stop in the first place. *Page 792 
We conclude, in light of the authority discussed above, that the scant evidence provided by Deputy Hargett concerning the nature of the Wal-Mart telephone call provides insufficient indicia of reliability to establish the requisite "reasonable suspicion" required under Terry for an investigative stop. As explained, no evidence was presented to indicate that any police work preceding the stop in any way corroborated the telephone tip so as to cumulatively provide "reasonable suspicion," as discussed in State v. White. In the absence of the constitutionally required reasonable suspicion to support the initial stop, none of the evidence gained as a result of that stop or the ensuing detention is properly admissible. Accordingly, the trial court erred when it denied Shaver's motion to suppress the evidence, and the Court of Criminal Appeals erred in affirming the trial court's judgment. The judgment of the Court of Criminal Appeals is therefore reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, and WOODALL, JJ., concur.
JOHNSTONE, J., concurs specially.
[1] Pseudoephedrine is a "precursor chemical" listed in §20-2-181, Ala. Code 1975, that may be used in the manufacture of the controlled substance methamphetamine.
[2] "[I]n State v. Vereb, 643 N.W.2d 342 (Minn.Ct.App. 2002), the evidence indicated that a Wal-Mart employee had telephoned the police and informed them that two men had purchased a large number of pills containing cold medication and that the men had made several trips into the store to purchase the pills. When the police arrived at the Wal-Mart store, the employee who had telephoned them informed the officer that the men had just left in a vehicle and provided information about the direction in which the vehicle had gone; the employee also rode with the police to locate the vehicle. When the employee spotted the vehicle and the police officer attempted to follow it, the vehicle began to pull away from the police vehicle and reached speeds in excess of 75 miles per hour. Another police officer was able to eventually stop the vehicle and over 30 boxes of cold-medication pills were found in the vehicle. Although the speeding violation was sufficient by itself to establish probable cause to stop the vehicle, the Minnesota Court of Appeals also held that there was reasonable suspicion to conduct a Terry
stop of the vehicle based on the information received from the Wal-Mart employee. Compare State v. Bergerson, 659 N.W.2d 791
(Minn.Ct.App. 2003) (distinguishing Vereb and holding that a telephone call from an employee of a hardware store where the appellant had purchased rubber tubing and acetone, without more, was not sufficient to establish reasonable suspicion for aTerry stop of the appellant's vehicle).
"Similarly, in State v. Bulington, 783 N.E.2d 338
(Ind.Ct.App. 2003), the evidence indicated that Cassie Oakley, an employee at a Meijer Superstore who had been advised by Meijer's loss-prevention personnel to be aware of activity involving decongestants or other precursor chemicals that could be used in the manufacture of methamphetamine, observed two individuals standing near a display of nasal decongestant. The State presented testimony that a local drug task force had requested to be notified of anyone who purchased, among other things, three or more boxes of cold medicine. The evidence indicated that Dan Majors, Meijer's in-store detective, observed the two individuals select three boxes each of ephedrine, purchase the boxes at different checkout counters, act as if they did not know each other when leaving the store, and then get in the same vehicle and remove the pills from the boxes and put them in shopping bags. Majors telephoned the police and alerted them to the activities, and an officer arrived just as the suspects' vehicle was leaving the parking lot of the store. The officer confirmed, via the dispatcher who was speaking with Majors, which vehicle the suspects were in, and then initiated the stop of the vehicle. Bulington was driving the vehicle and the officer subsequently discovered over 100 pills containing ephedrine in the vehicle. In holding that the trial court had erroneously granted Bulington's motion to suppress, the Indiana Court of Appeals noted specific testimony that had been presented at the suppression hearing, such as the testimony that the local drug task force had requested Meijer employees to provide them with information about activity involving purchases of precursor chemicals, the testimony of both employees from the Meijer Superstore that had been involved, and the officer's rendition of the information that he had been provided by the dispatcher while he was en route to the store and in verifying that he was about to stop the correct vehicle."
Shaver, 894 So.2d at 778-79 (Shaw, J., dissenting).