The State of Alabama appeals from the trial court's order suppressing evidence recovered from the search of an automobile driven by James Virgil Strickland during a *Page 1085 
traffic stop incident to Strickland's arrest. An appeal by the State is appropriate in this case. See Rule 15.7(a), Ala.R.Crim.P. (stating that "an appeal may be taken by the state to the Court of Criminal Appeals from a pre-trial order of the circuit court (1) suppressing a confession or admission or other evidence. . . ."); State v. A.R.C., 873 So.2d 261, 266
(Ala.Crim.App. 2003) (holding that the State has a limited right to appeal but "[t]he State can appeal a pretrial ruling . . . suppressing evidence. . . .").
Strickland was indicted for unlawful manufacture of a controlled substance (methamphetamine) in the first degree, a violation of § 13A-12-218, Ala. Code 1975.[1] This charge was based upon Strickland's being found in possession of pseudoephedrine, a "precursor substance" or "precursor chemical," as those terms are used in §§ 13A-12-217(a)(2) and 20-2-181, Ala. Code 1975.
On June 22, 2004, Strickland filed a motion to suppress "any and all evidence obtained through the illegal search of Defendant, his property, possessions and residence. . . ." (C. 54.) On August 17, 2004, a suppression hearing was conducted, and on August 19, 2004, the trial court entered an order, stating: "Based on the testimony and on the case cited by Defendant (Exparte Brian Shaver, [894 So.2d 781 (Ala. 2004)]), this Court finds Defendant's Motion to Suppress is hereby GRANTED." (C. 57.)
On appeal, the State argues that the trial court misapplied Exparte Shaver, 894 So.2d 781 (Ala. 2004). Additionally, the State argues, the facts in the present case are distinguishable from those in Shaver. Strickland counters by arguing that the trial court properly interpreted and applied Shaver in granting his motion to suppress.
In State v. Hill, 690 So.2d 1201 (Ala. 1996), a case involving the State's appeal from the trial court's order granting of a motion to suppress, the Alabama Supreme Court wrote:
 "We stated in Ex parte Agee, 669 So.2d 102 (Ala. 1995):
 "`Where evidence is presented to the trial court ore tenus in a nonjury case, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442 (Ala. 1995). However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment. Ex parte Board of Zoning Adjustment of the City of Mobile, 636 So.2d 415 (Ala. 1994).'
 "669 So.2d at 104. `Where the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and the Supreme Court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court's application of the law to those facts.' Stiles v. Brown, 380 So.2d 792, 794 (Ala. 1980) (citations omitted). The trial judge's ruling in this case was based upon his interpretation of the term `reasonable suspicion' as applied to an undisputed set of facts; the proper interpretation is a question of law."
Hill, 690 So.2d at 1203-04.
The facts in this case are not materially disputed. As a result, we apply a de novo standard of review. *Page 1086 
 I.
Because the trial court relied upon Ex parte Shaver, we begin our analysis with a detailed discussion of that case. InShaver, the defendant entered a guilty plea to the charge of unlawful manufacture of a controlled substance (methamphetamine) but reserved the right to appeal the issue whether the trial court erred by refusing to grant his motion to suppress the evidence obtained subsequent to his being stopped by the police. That evidence, pseudoephedrine, and the defendant's acknowledgment that he intended to use the pseudoephedrine to produce methamphetamine formed the basis for the resulting drug charges. This Court, in an unpublished memorandum, affirmed the guilty-plea conviction; two judges dissented. Judge Shaw, in his dissenting opinion, joined by Judge Cobb, wrote that the police officer lacked "reasonable suspicion" to stop the defendant and that the defendant's motion to suppress should have been granted. The defendant appealed to the Alabama Supreme Court, and the Supreme Court, in large part adopting Judge Shaw's dissenting opinion, reversed the judgment of this Court.
In Shaver, the defendant and two other people went into a Wal-Mart discount department store in Russellville and purchased several packages of pseudoephedrine, an over-the-counter cold medicine — a recognized "precursor chemical" under §20-2-181(d)(15), Ala. Code 1975 — that is commonly used to manufacture an illegal drug, methamphetamine. This information was conveyed to the Russellville Police Department by an unidentified caller; the police dispatcher, in turn, advised its officers to be on the lookout for the vehicle. A Russellville police officer spotted the three individuals in a nearby parking lot and detained the individuals until a deputy sheriff arrived to assist him. The deputy walked over to the defendant's vehicle and saw, in plain view, the pseudoephedrine tablets. The defendant and his companions were placed under arrest, after which the defendant conceded that they were likely going to use the pseudoephedrine to cook methamphetamine.
At the suppression hearing in Shaver, the State's only witness was the deputy sheriff who assisted the Russellville police officer. He conceded that the defendant's car was stopped by the Russellville police officer as a result of the police radio dispatch, conveying information that had been received from the unidentified caller. The deputy testified that he heard the initial dispatch given out over the police radio, but he could not testify about the reliability of the person who made the call to the police. The deputy also stated that he could not testify about what reasonable suspicion the police officer had for stopping the defendant's vehicle.
In reversing the judgment of this Court, the Alabama Supreme Court wrote:
 "The point made by Judge Shaw's dissent, which we find dispositive, is that the only basis the police had for detaining Shaver's vehicle, established by Deputy Hargett's testimony, was a telephone call from an unknown individual who was purportedly calling from the Wal-Mart discount department store at which the pseudoephedrine had been purchased. The record does not supply any information concerning the telephone call to the police from the Wal-Mart store other than Deputy Hargett's testimony that he heard the Russellville police officers giving information about a telephone call they had received from Wal-Mart. The transcript of the suppression hearing contains no evidence to support the conclusion that the caller was in any way reliable. For example, contrary to the recitations in the unpublished *Page 1087 
memorandum, there is no evidentiary basis from which to infer that the telephone caller was a Wal-Mart employee, or even that the caller was a `she,' or that the caller had any direct knowledge of what Shaver had purchased at Wal-Mart. Deputy Hargett testified to no specifics concerning the information conveyed by the Wal-Mart caller, such as whether the caller supplied any description of Shaver or a member of his party, whether the caller described Shaver's vehicle, or whether the caller supplied any information with respect to the amount of pills containing pseudoephedrine that had been purchased. In addition, Judge Shaw's dissent correctly notes:
 "`[N]o testimony about any Wal-Mart policies regarding the purchase of products containing precursor chemicals was presented at the suppression hearing. While there are many cases from various jurisdictions referencing the laudable policies of retailers attempting to limit the amount of various precursor chemicals that one can purchase, there was no testimony in this case that the maximum number of pills containing pseudoephedrine that could be purchased under Wal-Mart's policy was three boxes, as the memorandum states, and there was no evidence indicating that Wal-Mart, either in general or the Russellville Wal-Mart in particular, had a policy of working with local law enforcement to curtail the purchase of large quantities of precursor chemicals that could be used to manufacture methamphetamine.'[5]
 "`[5]I am aware that in State v. Odom, 872 So.2d 887 (Ala.Crim.App. 2003), this Court noted that "Wal-Mart has the policy of notifying the police when customers purchase more than three boxes of cold medications." 872 So.2d at 889. However, in Odom,
there was testimony from the police officer about the details of the appellant's purchases, as told to the officer by an off-duty officer who actually observed the appellant's purchases — the defendant went through the checkout line "several" times purchasing items that that officer had been trained to recognize could be used to manufacture methamphetamine. In that case, the testimony presented at the suppression hearing as included in the record on appeal was sufficient to support the trial court's finding that a reasonable suspicion, in fact, that probable cause, existed. Here, there is simply no such testimony in the record.'
 "894 So.2d at 789-90 (citations to the record omitted) [footnotes 3 and 4 omitted].
 "Moreover, for all that is shown in the record, Shaver's vehicle was stopped as the result of a telephone call to the police from the Wal-Mart store without any intervening police investigation; there is no indication in the record that the police did anything to corroborate the information given in the telephone call from Wal-Mart before stopping Shaver's vehicle. It was only after the vehicle had been detained that Deputy Hargett arrived and saw the packages of pills containing pseudoephedrine in `plain view' in the vehicle. We are therefore left to determine whether the evidence in the record concerning the telephone call from the Wal-Mart store where the purchase of pseudoephedrine was made was sufficient to establish the necessary `reasonable suspicion' for law-enforcement officers to stop and detain Shaver's vehicle. As Judge Shaw's dissent notes, the applicable law on the *Page 1088 
distinction between a tip from a reliable informant and an anonymous tip for the purpose of establishing reasonable suspicion for an investigatory stop is discussed in State v. White, 854 So.2d 636
(Ala.Crim.App. 2003):
 "`"The United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889
(1968), held that `a police officer may, in appropriate circumstances and in an appropriate manner, approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest.' 392 U.S. at 22, 88 S.Ct. at 1880. The standard for allowing a Terry stop is whether there is a reasonable suspicion that `the person being stopped has engaged in some type of criminal activity.' Webb v. State, 500 So.2d 1280, 1281 (Ala.Crim.App.), cert. denied, 500 So.2d 1282 (Ala. 1986)."
 "`Ex parte Carpenter, 592 So.2d 627, 629 (Ala. 1991).
 "`"It is well settled that `[i]nformation provided by a reliable informant can provide the reasonable suspicion required to justify a Terry stop.' Lamar v. State, 578 So.2d [1382] at 1385 [(Ala.Crim.App. 1991),] and authorities cited therein. Whether the information provided by an informant in a particular case is sufficient to establish reasonable suspicion is to be determined by applying the `totality of the circumstances' test set out in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Alabama v. White, 496 U.S. [325] at 330-31, 110 S.Ct. [2412] at 2416 [(1990)]. Under this test, which was formulated in the context of probable cause, the informant's `veracity,' `reliability,' and `basis of knowledge' are `highly relevant' factors to be considered. Gates, 462 U.S. at 230, 103 S.Ct. at 2328. However, because reasonable suspicion is a lower standard, there need not be as strong a showing with regard to these factors as is required for the establishment of probable cause, Alabama v. White, 496 U.S. at 330-31, 110 S.Ct. at 2415."
 "`Wilsher v. State, 611 So.2d 1175, 1179
(Ala.Crim.App. 1992).
 "`. . . .
 "`"Because the veracity of the person giving [an] anonymous tip is `by hypothesis largely unknown, and unknowable,' Illinois v. Gates, 462 U.S. [213] at 237, 103 S.Ct. [2317] at 2331 [(1983)], and because ordinary citizens do not generally provide extensive recitations of the basis of their everyday observations, an anonymous tip, without more, seldom demonstrates an informant's reliability or the basis of the informant's knowledge."
 "`Ex parte Barnette, 624 So.2d 507, 508 (Ala. 1993). However, in Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the United States Supreme Court held that a tip from an anonymous informant could provide reasonable suspicion for an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), if the tip was sufficiently corroborated through independent police work. The Court stated:
 "`"Illinois v. Gates, 462 U.S. 213 (1983), dealt with an anonymous tip in the probable-cause context. The Court there abandoned the `two-pronged test' of Aguilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. *Page 1089 United States, 393 U.S. 410 (1969), in favor of a `totality of the circumstances' approach to determining whether an informant's tip establishes probable cause. Gates made clear, however, that those factors that had been considered critical under Aguilar and Spinelli — an informant's `veracity,' `reliability,' and `basis of knowledge' — remain `highly relevant in determining the value of his report.' 462 U.S., at 230. These factors are also relevant in the reasonable-suspicion context, although allowance must be made in applying them for the lesser showing required to meet that standard.
 "`"The opinion in Gates recognized that an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is `by hypothesis largely unknown, and unknowable.' Id., at 237. This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for a Terry [v. Ohio, 392 U.S. 1 (1968),] stop. But the tip in Gates was not an exception to the general rule, and the anonymous tip in this case is like the one in Gates: `[It] provides virtually nothing from which one might conclude that [the caller] is either honest or his information reliable; likewise, the [tip] gives absolutely no indication of the basis for the [caller's] predictions regarding [White's] criminal activities.' 462 U.S., at 227. By requiring `[s]omething more,' as Gates did, ibid., we merely apply what we said in Adams [v. Williams, 407 U.S. 143 (1972)]: `Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized,' 407 U.S. at 147. Simply put, a tip such as this one, standing alone, would not `"warrant a man of reasonable caution in the belief" that [a stop] was appropriate.' Terry, supra, quoting Carroll v. United States, 267 U.S. 132, 162 (1925).
 "`"As there was in Gates, however, in this case there is more than the tip itself. The tip was not as detailed, and the corroboration was not as complete, as in Gates, but the required degree of suspicion was likewise not as high. We discussed the difference in the two standards last Term in United States v. Sokolow, 490 U.S. 1, 7 (1989):
 "`"`The officer [making a Terry stop] . . . must be able to articulate something more than an "inchoate and unparticularized suspicion or `hunch.'" [Terry,
392 U.S.] at 27. The Fourth Amendment requires "some minimal level of objective justification" for making the stop. INS v. Delgado, 466 U.S. 210, 217 (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," [Gates, 462 U.S., at 238], and the level of suspicion required for a Terry
stop is obviously less demanding than for probable cause.'
 "`"Reasonable suspicion is a less demanding standard than probable cause not only in the sense that *Page 1090 
reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Adams v. Williams, supra, demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a Terry stop. 407 U.S., at 147. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors — quantity and quality — are considered in the `totality of the circumstances — the whole picture,' United States v. Cortez, 449 U.S. 411, 417 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. The Gates Court applied its totality-of-the-circumstances approach in this manner, taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work. The same approach applies in the reasonable-suspicion context, the only difference being the level of suspicion that must be established. Contrary to the court below, we conclude that when the officers stopped respondent, the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that respondent was engaged in criminal activity and that the investigative stop therefore did not violate the Fourth Amendment.
 "`". . . .
 "`"We think it also important that, as in Gates, `the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.' Id., at 245. The fact that the officers found a car precisely matching the caller's description in front of the 235 building is an example of the former. Anyone could have `predicted' that fact because it was a condition presumably existing at the time of the call. What was important was the caller's ability to predict respondent's future behavior, because it demonstrated inside information — a special familiarity with respondent's affairs. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel. Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities. See ibid. When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but *Page 1091 
also that he was well informed, at least well enough to justify the stop.
 "`". . . ."
 "`496 U.S. at 328-32. . . .'
 "854 So.2d at 638-42 (some emphasis original; some emphasis added).
 "The discussion in Judge Shaw's dissent of State v. Vereb, 643 N.W.2d 342 (Minn.Ct.App. 2002); and State v. Bulington, 783 N.E.2d 338 (Ind.Ct.App. 2003),² also appropriately points out that in each of those cases, the telephone call supporting the finding that there was a reasonable suspicion for a Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), investigatory stop had many more indicia of reliability than are present in this case. This Court discussed such indicia in Ex parte Kelley, 870 So.2d 711 (Ala. 2003), where we concluded that an experienced narcotics officer who observed a `furtive' transaction between the defendant and a known drug dealer at a bar that was known to be a place where drug transactions were common established sufficient reasonable suspicion for a Terry stop of the defendant. Thus, in Kelley reasonable suspicion for a Terry stop was based upon the investigating officer's personal observation of a suspicious transaction by a known drug dealer in an area where drug transactions were common. In this case, the evidence before us shows only that the police received a telephone call from an unidentified person at a Wal-Mart discount store informing them that Shaver and the two women had purchased pills containing pseudoephedrine. Contrary to the view expressed in the unpublished memorandum, `Shaver and Aaron's subsequent statements that the pseudoephedrine would ultimately be used to manufacture methamphetamine,' cannot be a factor supporting a finding of reasonable suspicion to make the vehicle stop in the first place.
 "We conclude, in light of the authority discussed above, that the scant evidence provided by Deputy Hargett concerning the nature of the Wal-Mart telephone call provides insufficient indicia of reliability to establish the requisite `reasonable suspicion' required under Terry for an investigative stop. As explained, no evidence was presented to indicate that any police work preceding the stop in any way corroborated the telephone tip so as to cumulatively provide `reasonable suspicion,' as discussed in State v. White. In the absence of the constitutionally required reasonable suspicion to support the initial stop, none of the evidence gained as a result of that stop or the ensuing detention is properly admissible. Accordingly, the trial court erred when it denied Shaver's motion to suppress the evidence, and the Court of Criminal Appeals erred in affirming the trial court's judgment. . . .
 "²[I]n State v. Vereb, 643 N.W.2d 342 (Minn.Ct.App. 2002), the evidence indicated that a Wal-Mart employee had telephoned the police and informed them that two men had purchased a large number of pills containing cold medication and that the men had made several trips into the store to purchase the pills. When the police arrived at the Wal-Mart store, the employee who had telephoned them informed the officer that the men had just left in a vehicle and provided information about the direction in which the vehicle had gone; the employee also rode with the police to locate the vehicle. When the employee spotted the vehicle and the police officer attempted to follow it, the vehicle began to pull away from the police *Page 1092 
vehicle and reached speeds in excess of 75 miles per hour. Another police officer was able to eventually stop the vehicle and over 30 boxes of cold-medication pills were found in the vehicle. Although the speeding violation was sufficient by itself to establish probable cause to stop the vehicle, the Minnesota Court of Appeals also held that there was reasonable suspicion to conduct a Terry stop of the vehicle based on the information received from the Wal-Mart employee. Compare State v. Bergerson, 659 N.W.2d 791 (Minn.Ct.App. 2003) (distinguishing Vereb and holding that a telephone call from an employee of a hardware store where the appellant had purchased rubber tubing and acetone, without more, was not sufficient to establish reasonable suspicion for a Terry stop of the appellant's vehicle).
 "`Similarly, in State v. Bulington, 783 N.E.2d 338
(Ind.Ct.App. 2003), the evidence indicated that Cassie Oakley, an employee at a Meijer Superstore who had been advised by Meijer's loss-prevention personnel to be aware of activity involving decongestants or other precursor chemicals that could be used in the manufacture of methamphetamine, observed two individuals standing near a display of nasal decongestant. The State presented testimony that a local drug task force had requested to be notified of anyone who purchased, among other things, three or more boxes of cold medicine. The evidence indicated that Dan Majors, Meijer's in-store detective, observed the two individuals select three boxes each of ephedrine, purchase the boxes at different checkout counters, act as if they did not know each other when leaving the store, and then get in the same vehicle and remove the pills from the boxes and put them in shopping bags. Majors telephoned the police and alerted them to the activities, and an officer arrived just as the suspects' vehicle was leaving the parking lot of the store. The officer confirmed, via the dispatcher who was speaking with Majors, which vehicle the suspects were in, and then initiated the stop of the vehicle. Bulington was driving the vehicle and the officer subsequently discovered over 100 pills containing ephedrine in the vehicle. In holding that the trial court had erroneously granted Bulington's motion to suppress, the Indiana Court of Appeals noted specific testimony that had been presented at the suppression hearing, such as the testimony that the local drug task force had requested Meijer employees to provide them with information about activity involving purchases of precursor chemicals, the testimony of both employees from the Meijer Superstore that had been involved, and the officer's rendition of the information that he had been provided by the dispatcher while he was en route to the store and in verifying that he was about to stop the correct vehicle.'
 "Shaver, 894 So.2d at 778-79 (Shaw, J., dissenting)."
894 So.2d at 786-92.
 II.
To determine whether, in light of Ex parte Shaver, the trial court's ruling was appropriate under the facts and circumstances presented in this case, a detailed review of the facts presented at the suppression hearing is necessary. At the hearing, the State called three witnesses to testify: Kim Reedy, an employee of the Dollar Store discount store, and Officers William Schuhart and Travis Phillips, police officers employed with the Tuscaloosa *Page 1093 
Police Department. Reedy testified that she arrived at work at the Dollar Store[2] in Tuscaloosa at about 10 or 11 a.m. on June 28, 2003, and that she worked until the store closed at 7 p.m. According to Reedy, she was working the cash register when a man, whom she identified at the hearing as Strickland,[3]
came into the store and bought "more than three" boxes of "nasal decongestant." She testified that Strickland returned a second time, and that she saw him browsing around the store; however, Reedy did not know what he purchased on this occasion because she was not working the cash register. She saw Strickland a third time later that same day when Strickland came up to the cash register, which she was again operating, and attempted to buy three boxes of Sudafed brand nasal decongestant.[4] (R. 5-9, 13.) Reedy testified as follows:
 "Q. And when he attempted to buy some more boxes that third time what, if anything, occurred?
 "A. I was acting like I was being friendly, and I was like `So, why, what are you going to do with all this medication?'
 "He was like `You really want to know?' I was like `Yeah.' So, he told me he was going to take it to a friend or partner of his and that is what they were going to do. He asked me if I had ever heard of methamphetamine, and I told him yes.
 "Q. Okay. And he told you that?
 "A. Yeah.
 "Q. And did he buy those additional boxes of Sudafed?
 "A. No.
 "Q. Did he attempt to buy those additional boxes of Sudafed?
 "A. Yeah.
 "Q. In what way did he attempt to buy them?
 "A. He offered me, I think it was, ten to twenty dollars because I told him I couldn't ring it up again. He offered me ten or twenty dollars, and I told him I couldn't."
(R. 9-10.) Reedy then testified that she notified her manager, Frances Akin, what had happened. Reedy stated that she told Akin what type of vehicle Strickland was driving. According to Reedy, Akin looked outside, saw the vehicle, and wrote down the license-plate number. Reedy stated that Akin then telephoned the police, that she heard Akin relate to the police dispatcher the recent events concerning Strickland, and that Akin provided the police with a description of the car in which Strickland had left, including the car's license-plate number. (R. 10-12, 15.) Reedy testified that Officer Schuhart came by the Dollar Store, and that she told Officer Schuhart about her encounters with Strickland. (R. 12-13.)
Officer Schuhart testified that, on June 28, 2003, he received a dispatch to go by the Dollar Store on a "suspicious person call," based upon a white male's having *Page 1094 
been in the store and having purchased large quantities of Sudafed brand decongestant. Officer Schuhart testified that he arrived at the store and spoke to Reedy. Officer Schuhart testified that Reedy told him that a man had come into the store on three separate occasions; that the man had attempted to buy all of the pseudoephedrine[5] the store had on the first occasion, but that Reedy told the man he could buy only three boxes; that the man returned a second time and offered her money to buy all the pseudoephedrine, but that she would not let him, and the man bought three more boxes; and that the man returned a third time but did not purchase any pseudoephedrine. Officer Schuhart also testified that he was told that Akin followed the man to his car on the third occasion and copied down his license-plate number. (R. 16-19.) Officer Schuhart then testified:
 "Q. Was that information that was conveyed to you about the car and the tag?
 "A. Yeah. The complainant, which is the manager, told [me] that it was — she wasn't sure on the actual make of the car. She said it was either an older model Buick or a Ford classic type vehicle. She did get the tag number down. I remember she wrote it down on a piece of paper and handed it to me.
 "Q. And when you took that information, did you call in any of that information to dispatch or not?
 "A. Yes. I put out what we call a BOLO, which is be-on-the-lookout.
 "Q. Do you remember what the BOLO was?
 "A. I just gave the description of the suspect that I had gotten, the information from the witness, which was the clothing, approximate height and weight, approximate age of the suspect and the tag number.
 "Q. Did you get into the particulars of what occurred in the store when you gave the BOLO as to why to look out for him?
 "A. You know, it's been a while. I really don't know if — when they dispatch it, you know, they put over the air as to why and the reason for me going over there. I can't be for sure whether or not I restated what the nature of the call was.
 "Q. When you were dispatched, that information was provided to you?
 "A. Yes, sir."
(R. 19-20.) Officer Schuhart testified that he subsequently heard over the radio that another officer had stopped the vehicle. (R. 20.) On cross-examination, Officer Schuhart testified that he was not sure if the license-plate number had been given out by dispatch. He also stated that information from the license-plate number revealed that the automobile was registered to a female with the last name Strickland and was a 1986 Cadillac DeVille. (R. 22-23.)
Officer Phillips testified that he was on duty on June 28, 2003, when he heard a BOLO over the police radio. (R. 24-25.) He testified:
 "Q. Can you tell me, if you remember, what the nature of the BOLO was?
 "A. A BOLO came out be-on-the-lookout for a white male in a white mid-eighties four-door vehicle, suspect was seen at [the Dollar Store] trying to buy amounts of Sudafed or nasal decongestant in larger quantity amounts.
 "Q. And was there a description of the car and/or a tag [number] given out, if you remember? *Page 1095 
 "A. The car was a white four-door vehicle. The tag [number] came out as 32A76R.
 "Q. Having received this BOLO, did you keep a lookout to see if such a car crossed your viewing?
 "A. Yes, sir. I was going eastbound on 15th Street coming from Hackberry Lane, and as we passed [the Dollar Store] at approximately about Sixth Avenue East, me and my partner saw the vehicle. There was one car in between us and then he was ahead of that. We got around that one car and got behind that vehicle, and the tag matched, and that is when we conducted our traffic stop."
(R. 25-26.) Officer Phillips testified that the car drove a short distance further and pulled into a gasoline service station. He stated that the driver of the car stopped and got out of the vehicle and that his partner told the person to get back into the car. Officer Phillips testified that at that time the person started running and that he and his partner chased him down, caught him, and placed him under arrest. (R. 27.) Officer Phillips testified: "Due to him being taken into custody, we proceeded to search his vehicle." Officer Phillips stated that they found several boxes of Sudafed brand decongestant in the front floorboard on the driver's side and in the glove box and that in the trunk of the vehicle they found a black bag "which contained cooked methamphetamine." Officer Phillips identified Strickland as the person who was driving the car and who ran from the scene when they initiated a traffic stop. Officer Phillips also testified that Strickland gave them a false name, James Ray Smith, but that they later learned his true name. (R. 28-30.) Strickland's counsel did not ask Officer Phillips any questions at that time.
The attorneys and the trial court then discussed whether the facts of this case were distinguishable from those of Ex parteShaver. Strickland's counsel argued that the State did not establish whether Officer Phillips stopped Strickland after the first dispatch, when Officer Schuhart was directed to go to the Dollar Store, or after the BOLO was put out by Officer Schuhart. The trial court seemed concerned about this fact as well, and the court, on its own, recalled Officer Phillips to the stand to testify. (R. 31-38.)
The trial court then questioned Officer Phillips and asked him whether he stopped the vehicle after the first dispatch or after the BOLO. Officer Phillips testified that he did not recall. (R. 38.) The following colloquy then occurred:
 "THE COURT: The information that you received that you were looking for was what?
 "THE WITNESS: A white four-door mid-sized vehicle, possibly a Ford, possibly a Cadillac, with a 32 county[6] tag, and then they gave out the tag information itself with a white male driver.
 ". . . .
 "THE COURT: Do you know what time you made your stop?
 "THE WITNESS: It was approximately around five, five o'clock in the afternoon."
(R. 39.) Officer Phillips also testified that he was not certain that he heard the second BOLO that was issued by Officer Schuhart. (R. 39.) Officer Phillips then stated, based upon questioning from Strickland's counsel, that his report showed only that the vehicle they were *Page 1096 
looking for was "a white four-door vehicle" and that he did not indicate in the report "any specific make" of a vehicle, such as a Ford or Cadillac. (R. 39-40.) The prosecutor then asked further questions:
 "Q. In addition to the information about the description of the car and the tag, was there anything else in the BOLO given out about the suspect?
 "A. As far as like being a white male possibly leaving on 15th Street.
 "Q. Anything about the store?
 "A. The call came in that he was supposed to have been inside the store trying to buy Sudafed [brand decongestant] and that he had been there a couple of times before and that Officer Schuhart had been there once before checking it, and that is when the call came out that he was back at the store.
 ". . . .
 "Q. I am just wanting to know what information did you have that resulted in you stopping that car?
 "A. He was suspicious as being inside the Dollar Store, and the clerk had advised he was trying to buy Sudafed [brand decongestant] and that he had left in a white four-door vehicle and that he was headed on 15th Street.
 "Q. Is that what you remember as a result of what came out over the radio?
 "A. Yes, sir."
(R. 40-41.) Officer Phillips again told the trial court that he could not remember if the information he received was the information put out in the original dispatch or in the dispatch put out by Officer Schuhart. (R. 41.) Upon further questioning by Strickland's counsel, Officer Phillips also stated that the place where Strickland was stopped was about two and one-half blocks from the Dollar Store. (R. 42.)
The trial court then recalled Officer Schuhart to testify. Officer Schuhart testified that he believed the information that he was provided by Reedy and Akin was that Strickland was in the store the last time at about 4:30 p.m., and he stated that Akin would have telephoned the police station and the dispatch would have been sent out over the radio after 4:30 p.m. Officer Schuhart also testified that after he arrived at the store and was given the license-plate number to the vehicle in which Strickland had driven off, he would have requested the dispatcher to "run" the license-plate number over the air to attempt to find out to whom the vehicle was registered and that other officers would have heard this dispatch. Officer Schuhart indicated that his report was timed at 5:10 p.m., which would have been toward the end of his contact with the witnesses. (R. 43-45.) The following colloquy then occurred:
 "THE COURT: Do you know, sir, of your own personal knowledge whether Officer Phillips made his stop by the time you issued the second BOLO information?
 "THE WITNESS: I don't know. . . .
 "THE WITNESS: I know he came in contact toward the end of my report. That is how I actually got the suspect information. I don't know if I had given it out before or after."
(R. 45.)
Thereafter, the trial court stated:
 "THE COURT: I think it is clear that what we have, in my mind at least, is, if I follow this case, you basically have two BOLO's, that the arresting officer's arrest was based on information that came from the original BOLO, which is unsubstantiated information coming from [the Dollar Store] just like in the case of Shaver where you have Wal-Mart call in. You have an officer in the process of substantiating the information and ultimately does, I guess you would say, *Page 1097 
shore it up and verify it and even runs the check, but it sounds like it is now partly in the process and after the fact. Does that cure what the Shaver
case says you can't do[?]"
(R. 46.) The trial court thereafter entered its order granting Strickland's motion to suppress, resulting in this appeal.
 III.
We now apply the Supreme Court's decision in Ex parte Shaver
to the facts of this case. After carefully reviewing the Supreme Court's holding, we conclude that the trial court improperly suppressed the evidence in this case.
Initially, we note that the trial court, Strickland's brief, and the brief of amicus curiae all mistakenly refer to the person in Shaver who telephoned law-enforcement officials as "a Wal-Mart employee." However, as the Supreme Court stated in Exparte Shaver, "there is no evidentiary basis from which to infer that the telephone caller was a Wal-Mart employee. . . ."894 So.2d at 786. Moreover, although law-enforcement officials must have been provided with at least some information concerning a description of Shaver's vehicle, the details of that information were not presented at the suppression hearing. Thus, this Court cannot speculate as to what specific information was provided to the officers.
The basis of the Supreme Court's holding in Ex parte Shaver
was that corroboration was necessary in that case because the evidence presented at the suppression hearing indicated only that the substance of the officer's basis for initiating the traffic stop was that law-enforcement officials had received information via a telephone call from an unidentified person at a Wal-Mart discount department store indicating that a number of people had purchased several boxes of pseudoephedrine pills, and that that evidence was insufficient to establish reasonable suspicion to initiate the traffic stop. 894 So.2d at 786-87.
Contrary to Strickland's argument, we do not believe that the Supreme Court's holding in Ex parte Shaver should be interpreted as standing for the proposition that information relayed by an employee of a retail store to law-enforcement officials must always be treated as an anonymous tip requiring corroboration before reasonable suspicion can be established. Rather, the Court's holding stands for the proposition that, based on the record in that case, the unknown, unnamed, unidentified caller from Wal-Mart, who, for all that was shown in the record, may or may not have been an employee of Wal-Mart, must be viewed as an anonymous tipster, and that, because of the lack of testimony or evidence in the record indicating what information the caller actually provided to law-enforcement officials, the telephone call alone, without further testimony providing some other indicia of reliability before initiating Shaver's initial traffic stop, was insufficient to support a finding of reasonable suspicion.
By contrast, the record in this case contains a more detailed presentation of the evidence elicited during the suppression hearing. Here, Kim Reedy, an employee of the Dollar Store, testified at the suppression hearing as to her observations of Strickland's initial purchases of Sudafed brand decongestant and his attempts to purchase the additional boxes of Sudafed later in the day. Further, Reedy testified that she told her manager of the events and described Strickland's automobile to him, and that her manager obtained Strickland's license-plate number and telephoned police and relayed specific information to law-enforcement officials — including a description of Strickland's attempts to purchase the Sudafed brand decongestant, *Page 1098 
a description of his automobile, and the vehicle's license-plate number. Officer Travis Phillips testified that he initiated the traffic stop based on a BOLO for "a white mid-eighties four-door vehicle, suspect was seen at Dollar [Store] trying to buy amounts of Sudafed or nasal decongestant in larger quantity amounts" (R. 25); the license-plate number was also provided in the BOLO. Officer Phillips subsequently testified that he initiated the traffic stop based on the following: "`He was suspicious as being inside the Dollar Store, and the clerk had advised he was trying to buy Sudafed [brand decongestant] and that he had left in a white four-door vehicle and that he was headed on 15th Street.'" (R. 41.) Next, Officer William Schuhart testified that after the initial BOLO was issued, he went to the Dollar Store and interviewed the store manager who had placed the telephone call to law-enforcement officials, as well as Ms. Reedy, the clerk who had interacted with Strickland.
Unlike in Ex parte Shaver, the record indicates what information was provided to law-enforcement officials and the source of that information: the telephone call was placed by an employee of the store and the information relayed during that call included a description of the suspect, a description of the automobile, the license-plate number of the automobile, and information regarding the direction in which Strickland was last seen traveling. There was also evidence presented at the suppression hearing indicating that, at the time of the call, the caller's identity as an employee of the Dollar Store was ascertainable. Thus, this call should not be viewed as an anonymous tip. Rather, the caller was identifiable and subject to being located and held accountable for the information she provided to law-enforcement officials. Therefore, the information was more reliable than the information provided by an anonymous caller. See, e.g., Connecticut v. Bolanos, 58 Conn.App. 365,753 A.2d 943 (2000); and Playle v. Commissioner of PublicSafety, 439 N.W.2d 747 (Minn.Ct.App. 1989); see also 2 Wayne R. LaFave, Search and Seizure § 3.4 (3d ed. 1996) (containing an excellent discussion of how courts analyze information relayed to police by disinterested citizen informers, and noting in § 3.4(a) that corroboration is not always necessary when the report of one who appears to be an average citizen is made upon his or her personal observations of the commission of a crime). LaFave further notes that reliability may appear by the very nature of the circumstances under which the incriminating information became known and that when an average citizen tenders information to the police, the police should be permitted to assume they are dealing with a credible person, in the absence of special circumstances suggesting that such might not be the case. In short, the fundamental point made by LaFave is that "an ordinary citizen who reports a crime which has been committed in his presence, or that a crime is being or will be committed, stands on much different ground than a police informer." § 3.4(a), at 208.
The manufacture, use, and distribution of methamphetamine is a tremendous problem for law-enforcement officials in Alabama. Moreover, it is a problem that appears to be getting worse, not better. We do not interpret the Supreme Court's holding in Exparte Shaver as restricting law-enforcement officials from acting immediately upon information provided by retailers. Rather, we believe that the prosecution's case in Ex parteShaver was fatally defective because of what the Supreme Court characterized as the "scant evidence" provided by the lone witness who testified at the suppression hearing.894 So.2d at 792. By contrast, the record in the present case is more thoroughly *Page 1099 
developed. Accordingly, we conclude that the evidence presented here established a reasonable suspicion to support the initial traffic stop of Strickland.
Based on the foregoing, the trial court erred in granting Strickland's motion to suppress the evidence seized as a result of the traffic stop. The judgment of the trial court is hereby reversed, and the case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, P.J., and COBB, BASCHAB, SHAW, and WISE, JJ., concur.
[1] Strickland was also indicted for unlawful possession of a controlled substance ("cooked methamphetamine"), a violation of §13A-12-212, Ala. Code 1975, and obstruction of justice, a violation of § 13A-8-194, Ala. Code 1975, for providing police with a false name at the time of the traffic stop that resulted in his arrest.
[2] The store is referred to as the Dollar Store in some places in the record and as Dollar General in other places. The name of the store is not listed in the indictment. We will refer to the store as the Dollar Store in this opinion.
[3] Reedy testified that the person wore a hearing aid and mumbled when he spoke, but she could understand him. (R. 13-14.) Before the hearing started, the prosecutor informed the trial court that Strickland was hard-of-hearing and that he needed to face Strickland when he questioned witnesses so Strickland could read his lips. (R. 4-5.) The prosecutor reiterated this fact before each witness testified. (R. 5, 15, 24.)
[4] Reedy stated that Strickland was in the store on the last occasion at about "four something" in the afternoon. (R. 8.)
[5] The court reporter incorrectly spelled the word as "sudafedrine."
[6] The starting number or numbers on Alabama license plates represent a county; 32 is Fayette County.